307 Ga. 383
FINAL COPY

S19A0825, S19X0826.  FORD v. TATE; and vice versa.

BENHAM, Justice.

In 2005, Nicholas Cody Tate pleaded guilty to the murders of Chrissie Williams and her three-year-old daughter, Katelyn Williams, and to numerous related crimes.  He waived his right to a jury trial as to sentencing for the murders.  At the conclusion of a sentencing bench trial, the trial court found the existence of several statutory aggravating circumstances and sentenced Tate to death for each of the murders.  This Court unanimously affirmed Tate's convictions and death sentences.  See *Tate v. State,* 287 Ga. 364 (695 SE2d 591) (2010).  On January 31, 2012, the same day that his execution was scheduled to occur pursuant to an order signed by the trial court, Tate filed through counsel a petition for a writ of habeas corpus and a motion for a stay of execution.  Tate's scheduled execution was stayed, and he amended his petition on May 16, 2013.  The habeas court conducted an evidentiary hearing on June 9-10,

2014, and, in an order filed on December 27, 2018, the court denied relief with respect to Tate's convictions but granted relief with respect to his death sentences after finding that Tate received ineffective assistance of counsel at the sentencing trial.

In Case No. S19A0825, the Warden appeals the habeas court's vacation of Tate's death sentences, contending that the habeas court committed reversible error in concluding that trial counsel were prejudicially deficient in investigating and presenting mitigating evidence at the sentencing trial and in denying the Warden the opportunity to call Tate as a witness at the habeas evidentiary hearing. In Case No. S19X0826, Tate cross-appeals, contending that the habeas court committed reversible error in denying several claims, including several instances of ineffective assistance of counsel, the violation of his constitutional right to a speedy trial, the State's pursuit of contradictory theories, and post-conviction counsel's conflict of interest. In the Warden's appeal, we reverse and reinstate Tate's death sentences. In Tate's cross-appeal, we affirm.

2

## I. Factual Background.

The evidence presented at Tate's sentencing trial, including his videotaped custodial interview, showed the following. On the morning of December 11, 2001, 21-year-old Tate and two of his brothers, 18-year-old Dustin Tate and 15-year-old Chad Tate, loaded a number of weapons into Tate's truck and left their mother's home, where they resided. They drove to a local sporting goods store with a shopping list that included ammunition, duct tape, and extra-long zip ties. Tate went inside, accompanied by Dustin Tate, and purchased duct tape, a knife, and ammunition for various firearms, including a Winchester rifle, a nine-millimeter pistol, a .357

---

[1] The Warden has filed his appeal in this case as a direct appeal, which is authorized by the Code because the habeas court ruled, in part, "in favor of the petitioner" by vacating Tate's death sentences. OCGA § 9-14-52 (c). Where a habeas petitioner is denied relief and wishes to appeal, he or she generally must first seek authorization to "appeal" by filing an application for a certificate of probable cause to appeal. OCGA § 9-14-52 (a), (b). However, we have previously permitted habeas petitioners to pursue cross-appeals under OCGA § 5-6-38 (b) regarding the partial denial of their habeas petitions without first obtaining such a certificate of probable cause where, as here, the Warden is already appealing in the case. See, e.g., *Humphrey v. Nance,* 293 Ga. 189, 190 (744 SE2d 706) (2013) ("In Nance's cross-appeal, this Court affirms.").

Magnum revolver, and an AR15 semi-automatic rifle. The three brothers then drove to the home of Barry Williams and his wife, Chrissie Williams, whose sister was married to Tate's oldest brother, Curtis Tate. Tate had previously purchased methamphetamine from Barry Williams, and he and his younger brothers planned to burglarize the home, to steal drugs and money from the home, and to use a stun gun to rape Chrissie Williams.

Although Tate was aware that the Williams couple had temporarily lost custody of their children, he was not aware that Chrissie Williams had the children with her during the day pursuant to a reunification plan. Therefore, he expected Chrissie Williams to be home alone. However, when the three brothers arrived at the house, the Williamses's three-year-old daughter, Katelyn Williams, answered the door. Although the child recognized Tate and called him "Big Nick," her name for him, she was obviously frightened by the three males, who entered the home armed, and she began screaming and running throughout the house. Tate and Chad Tate cut the telephone lines to the home, and Dustin Tate

4

found Chrissie Williams sleeping in a bedroom with her two-year-old son in a crib beside her. When he shocked her with a stun gun, she awoke screaming, and Dustin Tate forced her to move to the bedroom across the hallway, intending to rape her there. At some point, both Tate and Chad Tate assisted Dustin Tate either in taping Chrissie Williams's mouth and eyes with duct tape or in handcuffing her hands to the bed's headboard and taping her legs to its footboard.

During an intense search for drugs and money, Tate rummaged through Chrissie Williams's purse, and he and Chad Tate ransacked the home, including turning furniture over, ripping the blinds off the windows, and removing heating vents. Tate attempted to silence Katelyn Williams's screams by taping her mouth with duct tape. After she continued to scream and run throughout the house, he placed her in the crib with her younger brother and told her to "shut up." When her brother started crying, Tate took her out of the crib, and she ran from him. Tate angrily ordered Chad Tate to "take her in the back bedroom" and quiet her.

Chad Tate complied with Tate's order, and he strangled Katelyn Williams with a telephone cord, rendering her unconscious. When she revived and began crying again, Tate allowed Chad Tate to have his knife. Chad Tate slit Katelyn Williams's throat multiple times and then pushed her off the bed and onto the floor, where she eventually bled to death.

When Tate and Dustin Tate saw what Chad Tate had done, Tate took Katelyn Williams's younger brother out of the crib and "let him go in the living room," and "Dustin w[ent] ape" and insisted that they had "to get out of [t]here." He was so distressed that Tate directed him to wait outside. Bound to the bed with her eyes and mouth taped, Chrissie Williams became "hysterical," and Tate pointed his Smith and Wesson nine-millimeter pistol at her face and threatened to beat her with it if she did not cease her attempts to scream. Then Tate placed a cushion over Williams's head and shoved his pistol into it, firing one shot into the side of Williams's head and killing her. Tate and Chad Tate locked the door behind them as they left the home, leaving Chrissie Williams's toddler son

6

inside.  The three brothers fled Georgia, kidnapped a woman and stole her vehicle in Mississippi, and finally surrendered to authorities in Oklahoma.  At the sentencing trial, the children's aunt testified that Katelyn Williams was wearing footed zip-up pajamas when she dropped Katelyn off at the home early on the morning of the crimes.  When the victims were discovered, Katelyn Williams's body was completely nude, and Tate admitted at his guilty plea hearing that he removed her pajamas for his sexual gratification.

## II.  Claims of Ineffective Assistance of Counsel.

In Case No. S19A0825, the Warden appeals the habeas court's determination that trial counsel were ineffective in the investigation and presentation of mitigation evidence.  In Case No. S19X0826, Tate appeals the habeas court's denial of his claims that trial counsel were ineffective regarding Tate's guilty plea, his interview by an acquaintance of the trial judge, his waiver of a jury trial as to sentencing for the murders, and the failure to present Chad Tate as a witness or to submit into evidence at the sentencing trial Chad

7

Tate's custodial interview and the plea colloquies of Chad Tate and Dustin Tate.

*A. Applicable Law.*

To prevail on his ineffective assistance of counsel claim, Tate must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. See *Strickland v. Washington,* 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Smith v. Francis,* 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). In determining whether counsel's performance was deficient, the relevant inquiry is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U. S. at 690 (III) (A). We must "indulge a strong presumption" that counsel's performance fell within "the wide range of reasonable professional assistance" and that counsel's decisions were made "in the exercise of reasonable professional judgment." Id. at 689, 690 (III) (A). The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular

8

circumstances of the case.  Id. at 689 (III) (A).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith,* 253 Ga. at 783 (1) (citing *Strickland,* 466 U. S. at 694 (III) (B)).  To determine prejudice in the sentencing phase of a case challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland,* 466 U. S. at 695 (III) (B).

"In reviewing a habeas court's ruling on an ineffective assistance claim, we accept the habeas court's findings of fact unless clearly erroneous and independently apply the law to those facts." *Sears v. Humphrey,* 294 Ga. 117, 119 (II) (A) (751 SE2d 365) (2013) (citation and punctuation omitted).  See *Humphrey v. Morrow,* 289

Ga. 864, 866 (II) (717 SE2d 168) (2011) (explaining that this Court adopts the habeas court's factual findings unless they are clearly erroneous but applies the facts to the law de novo in determining whether trial counsel performed deficiently and whether any deficiency was prejudicial).

*B. Pretrial and Trial Proceedings and Trial Counsel's Actions.*

We begin by reviewing the pretrial and trial proceedings and the course of action that trial counsel in fact followed. See *Franks v. State,* 278 Ga. 246, 250 (2) (A) (599 SE2d 134) (2004) (noting that, in order to address an ineffective assistance of counsel claim involving several alleged errors and omissions, the court properly first reviews the actions that trial counsel took). See also *Chandler v. United States,* 218 F3d 1305, 1320 (11th Cir. 2000). Then we address the various claims involving ineffective assistance of counsel raised on appeal by both the Warden and Tate, first discussing the Warden's contention in the direct appeal that the habeas court erred in finding that trial counsel were ineffective in investigating and presenting mitigation evidence in Tate's

sentencing trial and then, in turn, addressing the contentions raised in Tate's cross-appeal alleging that the habeas court erred in denying several ineffective assistance of counsel claims relating to the guilty plea and the sentencing trial.

The relevant undisputed facts in the record and the factual findings of the habeas court that are supported by the record show the following. After Tate and his brothers surrendered to authorities in Oklahoma on December 14, 2001, Tate waived his rights under *Miranda v. Arizona,* 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), and was interviewed by a special agent from the Georgia Bureau of Investigation ("GBI") and a detective from the Paulding County Sheriff's Department before being returned to Georgia. In this interview, Tate admitted that he and his brothers went to the Williams home with the intent to steal drugs and rape Chrissie Williams, that Dustin Tate used a stun gun on Chrissie Williams, and that she was bound to the bed with handcuffs and duct tape. He denied knowing who removed Katelyn Williams's clothing. However, he stated that Chad Tate "took her in the

11

bedroom and had his fun," explaining that he meant by that statement that Chad Tate sexually molested her, and he said that he and his brothers had been molested "very bad[ly]" as children by their older brother, Curtis Tate. He also stated that Chad Tate strangled Katelyn Williams with a telephone cord and then slit her throat. While he admitted that he shot Chrissie Williams through the head while she lay bound to the bed, he claimed that the gun misfired while he was pushing it into a cushion that he was holding over her head in an attempt to get her to be quiet. Tate and his brothers waived extradition and were returned to Paulding County approximately a week after their arrests.

On February 20, 2002, Tate was indicted by a Paulding County grand jury on two counts of malice murder, eight counts of felony murder, five counts of aggravated assault, two counts of kidnapping, four counts of burglary, one count of conspiracy to commit armed robbery, two counts of cruelty to children in the first degree, two counts of possession of a firearm during the commission of a felony, two counts of false imprisonment, and one count of child

12

molestation. Two days later, the trial court entered an order appointing Marc Cella to represent Tate.

In October 2002, Cella began plea negotiations with the State in Tate's case. In mid-November 2002, both Dustin Tate and Chad Tate entered into plea agreements with the State in which they received life sentences with a set term of years before which they could not seek parole. According to Cella's billing records, in January 2003, Cella discussed the possible options for a plea with Tate and his mother, and he obtained a draft plea agreement from the district attorney that offered Tate a non-negotiated sentence with a cap of a sentence of life without parole for the murder counts.[2] On May 6, 2003, Cella met with Tate for three hours to discuss the State's offer with him. However, ten days later, Cella informed the district attorney that there would be no deal.

Also in January 2003, the trial court entered a consent order

---

[2] Trial counsel's billing records were admitted without objection in the habeas proceedings, and each of Tate's trial attorneys affirmed his billing records in his habeas testimony.

directing Dr. Kevin Richards, a forensic psychologist at Northwest Georgia Regional Hospital ("Northwest Georgia"), to conduct an evaluation of Tate for the purpose of providing his opinion as to Tate's criminal responsibility and any mitigating factors regarding his mental status at the time of the crimes and also his opinion as to Tate's competence to stand trial. The order directed that Dr. Richards provide his written report only to the trial court and Cella. Dr. Richards opined that, at the time of the crimes, Tate was not delusional and recognized the difference between right and wrong and that he was competent to stand trial, but, as further discussed in our analysis below, his report contained a substantial amount of potentially mitigating information.

On July 8, 2003, the State filed its notice of intent to seek the death penalty against Tate. The record shows that Cella was well-prepared to continue representing Tate. At that time, he had been practicing law for over 20 years, had for most of that time maintained a private practice that was largely devoted to criminal defense, and had tried approximately ten death penalty cases to

verdict. The trial court designated Cella as lead counsel and appointed Bradley Reed as his co-counsel. Before recently opening his own private criminal defense practice, Reed had served as a Chatham County prosecutor for approximately six years, during which time he had tried several murder cases. Cella and Reed were qualified under the Unified Appeal Procedure ("UAP") to serve as lead and co-counsel respectively. See UAP II (A) (stating the minimum qualifications for any attorney appointed to serve as lead or co-counsel in a death penalty case). Cella explained that, because Tate's case was Reed's first death penalty case, he did not divide responsibility for the guilt/innocence phase and the sentencing phase between them, which was his usual practice; instead, the two attorneys "worked side by side." Trial counsel had a good working relationship and discussed strategy with each other and with Tate.

The record supports the habeas court's finding that "trial counsel met with [Tate] numerous times," during which they "had discussions with [Tate] about the crime, the weight of the State's evidence against him, and how the guilty pleas of [Tate]'s brothers

15

impacted his case." Trial counsel testified in the habeas proceedings that the evidence against Tate was overwhelming, that "[e]verybody pretty much knew what happened" as a result of both Tate's and Dustin Tate's "full, complete statement[s] in Oklahoma," and that the fact that both of Tate's co-defendant brothers had pleaded guilty hurt their client's case. Trial counsel also testified that Tate was "not too eager" about having a guilt/innocence phase and did not provide the names of any potential guilt/innocence phase witnesses. Nevertheless, trial counsel testified that they reviewed the voluminous discovery made available by the State, were prepared to try the case, and had formulated what they considered viable defenses, namely, to assert a defense of accident to the murder of Chrissie Williams, to challenge the sufficiency of the evidence regarding the child molestation count, and to argue that Tate did not actually kill Katelyn Williams, although counsel recognized that the State's "party to a crime" theory "br[ought] [Tate] back in."[3]

---

[3] See OCGA § 16-2-20.

16

After the State filed notice of its intent to seek the death penalty, trial counsel filed and litigated approximately 60 motions, including unsuccessful challenges to the grand and traverse jury array and a motion to exclude Tate's custodial statement that was also denied. In addition, counsel filed several ex parte motions, and, as a result, they retained an independent ballistics expert, Kelly Fite, and an investigator, Hal Johns.[4] Because Tate claimed to have shot Chrissie Williams when his gun misfired, counsel hired Fite, a former firearms examiner with the GBI Crime Lab, to verify the opinion of the State's expert that the murder weapon was working properly and to check the trigger pull. Following his review, Fite agreed with the State expert's conclusion that the murder weapon was in proper working order. Investigator Johns gathered records, served subpoenas, and did a limited amount of locating and interviewing witnesses.

On March 30, 2004, trial counsel met with Tate again, this

_____

[4] The relevant remaining ex parte motions filed by counsel are further discussed in our analysis below.

17

time to discuss presenting a plea offer from the defense to the State. After speaking with the district attorney, trial counsel prepared a proposed written plea agreement and met with Tate and his mother. However, on April 8, 2004, after discussing dropping the child molestation charge with the district attorney, trial counsel's billing records reflect that they spoke with Tate and his mother and noted "no plea." At the habeas evidentiary hearing, Reed recalled that Tate rejected a possible plea agreement for a non-negotiated sentence with a cap of life without parole because at that time Tate was adamant that he did not molest Katelyn Williams and, therefore, refused to plead guilty to child molestation, even if it meant avoiding a death sentence.[5]

In fact, the record shows that Tate eventually became convinced that the death penalty was the only appropriate punishment for his crimes. Cella testified that, "[i]n the beginning

---

[5] During his habeas testimony, Cella could not recall any serious plea negotiations, but the record, including Cella's own trial files and billing records, clearly supports the habeas court's factual findings regarding their occurrence.

[Tate] was a lot more cooperative and work[ed] with [trial counsel] toward a lighter sentence." He said that, as time passed, however, Tate began "manifesting" a much less cooperative attitude as a result of religious beliefs that he had developed while incarcerated awaiting trial. Cella explained as follows:

> [Tate] was not illiterate, but he wasn't a real skilled reader when he was arrested. He spent four years in jail, getting ready for trial, and in that time the only reading material that was readily available to him was the Bible, and he started reading the Bible and became a fairly intense biblical scholar. And he got the notion in his mind that he was forgiven because he asked to be forgiven and that he was going to heaven when he died. And he told me that was why he didn't care about the sentencing phase and he wanted the death penalty.

Reed also described Tate's change in attitude as an "evolving process," stating the following:

> The focus and the intensity of it seemed to gradually evolve. [Tate] didn't start out — the first time I met him he didn't want the death penalty. That's a situation that evolved over a four-year period, generally speaking.

Cella testified that, as soon as he noticed what he perceived as Tate's growing desire for the death penalty, he "tried over the time period in question several different approaches to change what [he]

19

saw as momentum going in that direction." Specifically, Cella encouraged Tate to consider "how his death in the Georgia death chamber might affect [his mother] and his brothers." He also tried to persuade Tate that his "mission" to obtain the death penalty was "akin to suicide" and that the afterlife might not be pleasant for someone who had committed multiple murders and suicide. According to Cella, however, nothing he said made any impact on Tate, and he continued "to get stronger in [his] desire [for the death penalty] over time."

After the trial court issued an order scheduling the trial to begin on October 24, 2005, trial counsel arranged for Dr. Richards to conduct a second evaluation of Tate, this time to determine whether he was competent to enter a guilty plea. Cella testified that, although he "knew it was a long shot that [Tate] would be found incompetent because he believed that he was going to heaven," Tate's "unyielding attitude" and "[his beliefs] w[ere] interfering with his ability to work with [trial counsel] and assist [them] in defending [him]." In his September 25, 2005 report, Dr. Richards concluded

20

that Tate was competent to enter a guilty plea, and he opined that Tate did "not currently suffer from any significant mental illness," noting that, while Tate had exhibited psychotic symptoms in the past, he "believ[ed that those] were primarily related to heavy drug use." He also found that Tate's religious beliefs did not constitute a "delusion" and that, based on those beliefs, Tate had made a reasonable decision on his course of action with regard to the charges against him.

Jury selection began the last week of October 2005, but on November 15, 2005, after three weeks of voir dire, Tate pleaded guilty to eight of the twenty-nine charges against him, including the two counts of malice murder and the child molestation count. Before entering his plea, Tate told the trial court that, contrary to his custodial statement, he intentionally shot Chrissie Williams and that he was "the one that took the little girl's clothes off" and "took her into the room with the intent on [sic] looking at her to get sexually aroused." Cella informed the trial court that Tate had decided to waive his right to a jury trial and to request the trial court

21

to conduct a bench trial as to sentencing for the two murders. Trial counsel had been unable to change Tate's attitude about his case, and, as Cella recounted in his habeas testimony, Tate "proceeded to tell the judge the fact that he deserved the death penalty, he wanted it, and he thought that's what he should get, based on [his religious beliefs]."

The sentencing bench trial began on November 28, 2005. According to Cella, trial counsel's investigation and preparation of the mitigation case had started "at the very beginning," as the "point in controversy" in Tate's case was why the crime occurred, a question that trial counsel investigated "[e]xtensively" and "tried to understand." The sentencing trial transcript supports trial counsel's testimony that their mitigation strategy involved the following: refuting the State's assertion that Tate was the leader of the group and thereby showing that he should not be the only one to die for "this set of circumstances"; showing that, during their flight after the murders, Tate intervened and protected the Mississippi kidnapping and carjacking victim from his brothers, which may

22

have prevented her rape and murder, and that he was the one who decided that the brothers would turn themselves and their "arsenal" of weapons over to authorities, a decision that likely avoided a "spectacular shootout"; pointing out that the death of the child had been caused by a person who was himself too young to get the death penalty; arguing that Tate, who at the time of the crimes "impressed as an uneducated, borderline illiterate person . . . weigh[ing] over 400 pounds," had become rehabilitated to the point that he was "a completely different person, both physically and mentally," by the time of trial, and that his story "[wa]s . . . worth telling [and] instructive"; and reminding the trial court that Tate was extremely remorseful and had taken responsibility for his crimes.

Trial counsel testified that they also wanted to present evidence of Tate's "horrible family background," which included his repeated molestation as a child by his older brother Curtis, physical abuse, a lack of parenting and education, and drug abuse. In the habeas proceedings, trial counsel could recall little specific information about what they did regarding investigating and

preparing for the sentencing trial, and their files contain relatively few notes regarding this area. However, the record shows that trial counsel filed affidavits of service with the court averring that the following were personally served with a subpoena to appear at trial: Oswald Tate, Tate's father; Debora Tate, Tate's mother; Tim Hollingshead, Curtis Tate's probation officer; Drew Lane, Curtis Tate's attorney in his molestation case; Major Sammy Goble, the lead investigator in Tate's case and the jail administrator at the time of Tate's sentencing trial; and Dr. Richards. In addition, trial counsel filed affidavits of service averring that the defense served a subpoena duces tecum for trial on the custodian of records at Northwest Georgia and at East Paulding Middle School to produce Tate's medical records and school records, respectively. Trial counsel also filed affidavits of service averring that the defense served Dustin Tate and Chad Tate, each an "incarcerated prisoner," with a subpoena for Tate's trial "by personally serving [the jail administrator] with said subpoena." Although both Dustin Tate and Chad Tate had been moved to state facilities to serve their

sentences, they were produced for the sentencing trial pursuant to the trial court's order of production. Reed recalled that he attempted to interview both Dustin Tate and Chad Tate in "anticipat[ion of calling] them to testify." However, only Chad Tate agreed to speak with him.[6] According to trial counsel, they were concerned that, "in his remorse and guilt, [Tate] might speak out to the Court and attempt to take more responsibility for the crimes than his brothers." Therefore, they hoped to present Dustin Tate and Chad Tate to testify that their roles in the crimes were consistent with their plea colloquies and custodial statements, specifically, that Chad Tate had killed Katelyn Williams of his own volition and that Tate had shot Chrissie Williams accidentally. Trial counsel also testified that they wanted to present evidence regarding Tate's background, particularly the molestation by his brother Curtis and

---

[6] The record shows that the defense investigator attempted to locate and serve Kimberly Tate Earwood, Tate's older sister, and Barry Williams, Chrissie Williams's husband, but was unsuccessful. Trial counsel testified that they would have wanted Tate's sister to testify as "a family member." They could not recall their strategy in trying to locate Barry Williams but pointed out that he had sold methamphetamine to the Tates.

its effect on him, through the testimony of lay witnesses. As further discussed in our analysis below, the record also shows that trial counsel intended to present Dr. Richards to testify regarding how Tate's drug use and his relationship with Dustin Tate affected his mental state at the time of the crimes.

At trial, the State presented 22 witnesses over four days, emphasizing its theory that Tate had been the group's leader. In support of this theory, the State attempted to submit a videotape obtained from Tate's bedroom pursuant to a search with a warrant. The State contended that, in addition to its relevance to show the non-statutory aggravating circumstance of Tate's use of drugs, the videotape was relevant to show that "Tate [wa]s in charge" on the morning of the crimes, as it depicted the three brothers interacting with each other in a manner that demonstrated that Tate was the leader among them. However, trial counsel's motion to exclude the videotape was successful, and it was not admitted.

Trial counsel were also able to elicit some mitigating testimony from several of the State's witnesses. On cross-examination, Angie

Rowzee, the Mississippi kidnapping victim, testified that Tate "was never mean to [her]," never made any sexual advances to her, and told her that he wanted to let her go back to her "perfect life." To support their argument that Tate was not "the leader of the gang and everybody just did what he said," counsel also obtained Rowzee's reaffirmation of her direct testimony that Tate told her that he had to talk to his brothers before releasing her. Rowzee also testified on cross-examination that she believed that Chad Tate and Dustin Tate planned to kill her because they talked about tying her up and not wanting to leave witnesses but that Tate talked them out of their plans to harm her.

Trial counsel also elicited testimony that Tate was fully cooperative with the agent from the Federal Bureau of Investigation ("FBI") who negotiated the brothers' surrender to law enforcement authorities, that he was "the one who volunteered [that] all the weapons were located" in an Oklahoma hotel room where the brothers had left them, and that he had told the agent that he did not "want anything to do with guns after what happened back

27

there," referring to the murders. During trial counsel's cross-examination of Major Goble, he testified that, in his present capacity as the jail administrator, he got along well with Tate and had not had "any problems at all" with him and that Tate had "asked [him] about some [religious] literature from time to time." Trial counsel also admitted Tate's videotaped custodial interview. After the videotape was played, counsel elicited testimony from Major Goble regarding numerous consistencies between Tate's statements in his custodial interview and the evidence that had been presented at the sentencing trial and also between Tate's statements and statements by Chad Tate in his custodial interview, particularly Chad Tate's statements regarding how he had taken Tate's knife to slit Katelyn Williams's throat.

However, after the State rested its case, trial counsel presented only two witnesses in mitigation. A chaplain at the Paulding County jail testified that he and Tate had met every Sunday for one hour throughout Tate's incarceration and that he had observed a "remarkable change" in Tate's grammar skills, was impressed with

28

Tate's interest in improving his vocabulary, spelling, and religious knowledge, and was "inspir[ed]" by "the things that [Tate had] done as a young man to grow in some wisdom." Tate's father testified that he "didn't feel like that one [of his children wa]s any more guilty than the other two," and he asked the trial court to give Tate a sentence like his other sons had received, life with the possibility of parole.

During closing argument, trial counsel stated that they disagreed with Tate's belief that the death penalty was the appropriate punishment, repeated Tate's description to the trial court during the plea hearing "that he was responding to what he called an order from Dustin" and that he would do anything "that pleased [Dustin]," reminded the court of Tate's involvement with drugs and his statement to the trial court at the guilty plea hearing that he did not want to use drugs as an excuse, stated that Tate was remorseful and had accepted responsibility, and pointed out that Tate had no criminal history. Trial counsel also argued the unplanned nature of the crimes, Tate's surprise on finding the

children at the home, the kidnapping victim's testimony indicating that Tate protected her from his brothers, Tate's peaceful surrender to and cooperation with the authorities, and the fact that Tate's genuine rehabilitation could be useful in that "others in society c[ould] learn and benefit from his story." Counsel argued that Tate had taken responsibility for his role in the crimes and that the punishment should be "in proportion to the individual's role," that there was no evidence that Tate murdered Katelyn Williams, that all three co-defendant brothers said that Chad Tate killed her but that he was not eligible for the death penalty because of his age, and that both of Tate's co-defendant brothers had accepted negotiated pleas in exchange for life sentences. Counsel asked for mercy and compassion and argued that a life sentence was appropriate. Trial counsel submitted correspondence to Tate from his mother and Dustin Tate and Curtis Tate's certified conviction for the molestation of Tate but did not refer to these exhibits in any way. On December 19, 2005, the trial court reconvened to announce its sentence and sentenced Tate to death for each of the murders.

*C. Ineffective Assistance of Counsel Claim Regarding Tate's Sentencing Trial.*

The habeas court concluded that Tate's trial counsel rendered ineffective assistance at his sentencing trial in that they failed to investigate and present mitigating evidence in several areas. The Warden contends that the habeas court erred as a matter of law in applying the principles of *Strickland* and its progeny to Tate's case, because the habeas court's analysis ignored its own factual findings, ignored testimony in both the trial and habeas proceedings that Tate did not want mitigation evidence to be presented, and ignored well-established law regarding those circumstances where a defendant interferes with trial counsel's efforts to present mitigating evidence.

The Warden is correct that there is a conflict between the habeas court's factual findings and its legal analysis. In particular, in its order, the habeas court made the following findings of fact: "The record shows that following trial counsel's attempts to negotiate a plea, [Tate] expressed a desire to plead guilty, *did not want trial counsel to present mitigation evidence, and wanted to*

31

*receive the death penalty.*" (Emphasis supplied.) Despite those factual findings, the habeas court applied *Strickland* and concluded that trial counsel were ineffective in investigating and presenting mitigating evidence, without also considering the United States Supreme Court's decision in *Schriro v. Landrigan* or related cases involving a defendant who was opposed to the presentation of mitigation evidence at trial. See *Schriro v. Landrigan,* 550 U. S. 465, 478 (III) (B) (2) (127 SCt 1933, 167 LE2d 836) (2007) (holding that a defendant who "interferes with counsel's efforts to present mitigating evidence to a sentencing court" cannot show prejudice under *Strickland* for counsel's failure to conduct an adequate investigation or to present such evidence); *Allen v. Secretary, Florida Dept. of Corrections,* 611 F3d 740, 762 (IV) (11th Cir. 2010) (explaining that "[t]he United States Supreme Court has told us in no uncertain terms that if a competent defendant did instruct his counsel not to offer any mitigating evidence, 'counsel's failure to investigate further could not have been prejudicial under *Strickland*'" (emphasis omitted) (quoting *Landrigan,* 550 U. S. at

32

475 (III) (A)).

As an initial matter, we reject Tate's contention, first made at oral argument and then more fully developed in a letter brief, that the foregoing factual findings about Tate's not wanting counsel to present mitigating evidence but, instead, wanting a death sentence are clearly erroneous because the citation to the record that immediately follows them does not support them. It is well settled that "[a] habeas court's factual findings cannot be found to be clearly erroneous if there is evidence in the record to support such findings." *Smith v. Magnuson,* 297 Ga. 210, 212 (1) (773 SE2d 205) (2015). See, e.g., *Upton v. Johnson,* 282 Ga. 600, 602 (652 SE2d 516) (2007). For the reasons discussed below, we concludethat the factual findings at issue *are* supported by the record.

> 1. *Tate's Expressed Intentions Regarding the Presentation of Mitigation Evidence and His Desire for the Death Penalty.*

The habeas court's factual findings that Tate did not want trial counsel to present mitigation evidence and that he wanted to receive the death penalty are pivotal here. That is so because, in order for

33

*Landrigan* to be applicable to Tate's case, the record must establish that the defendant clearly and unequivocally expressed an intention not to present any mitigating evidence or to limit the mitigation evidence. See *Landrigan*, 550 U. S. at 478 (III) (B) (1) (distinguishing Landrigan's case in which the record established that he informed his counsel not to present any mitigating evidence from cases where "the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented"). See also, e.g., *Morton v. Secretary, Florida Dept. of Corrections,* 684 F3d 1157, 1172-1173 (III) (B) (11th Cir. 2012) (applying *Landrigan* where the defendant limited the type of mitigating evidence that trial counsel could present). Our review of the record convinces us that it clearly supports the habeas court's findings.

To begin with, in regard to mitigation evidence, Reed testified in the habeas proceedings that, "[b]asically[, Tate] did not want to really put anything up." During the evidentiary hearing, the habeas court questioned Reed about "[his] comment about [Tate] not

34

wanting to call mitigation witnesses" by asking Reed:

> So, what type of response did you or co-counsel have to a client that was simply telling the judge to put him to death? Because if you don't have any mitigation, what are we doing here?

Reed stated that he and Cella "were exasperated because [they] felt like that [they] had a very strong mitigating case." However, "[t]he problem was that [Tate] took the position that he had committed a crime worthy of death, according to . . . the Bible." Reed explained that trial counsel had conversations with Tate during which they discussed his religious views and tried to persuade him differently but that Tate's beliefs dominated his thoughts about presenting mitigating evidence and, in turn, "overtook [counsel's] efforts to mitigate." At that point, the following colloquy between the habeas court and Reed took place:

> COURT: None of [the mitigating evidence that trial counsel wanted to present] could come out?
> WITNESS: Right. Because of the religious —
> COURT: And I presume that based on client confidence, you couldn't even express that to the [trial c]ourt, either? You're sort of stuck, right?

WITNESS: Our hands were tied, basically.[7]

Cella affirmed that Tate did not want counsel to even investigate mitigation evidence, and he testified that "[Tate] wanted to just go straight to death row." He explained that Tate did not want to have a trial but, instead, wanted to plead guilty to the death penalty, stressing that Tate "didn't want [trial counsel] to even try to save his life." In explaining why Tate "tolerated" what little mitigation evidence that trial counsel did present, Cella stated: "I told [Tate] I had to do it and that was what I was appointed for and if I didn't do it we were going to end up having to do this all over again."[8] At the habeas evidentiary hearing, Cella testified that, "[a]t the end," Tate "[w]ouldn't" work with him "[b]ecause he wanted the death penalty" and "wanted [Cella] to negotiate the death sentence."

Trial counsel's testimony is supported by Tate's own

---

[7] But see, e.g., *Landrigan,* 550 U. S. at 469 (I) (setting forth the defendant's colloquy with the sentencing court regarding his instructions to trial counsel that he did not wish to present mitigating evidence).

[8] Tate argues that Cella's testimony here shows that he would have "tolerated" the presentation of any additional mitigation evidence, but that argument is not consistent with a reading of trial counsel's testimony as a whole.

statements in the trial proceedings.  After informing the trial court

at his November 15, 2005 guilty plea hearing that he intentionally

killed Chrissie Williams, Tate stated:  "I do realize that I have done

wrong, and I believe that the punishment should fit the crime, life

for life."   The trial court subsequently asked Tate about that

statement and whether he "[h]ad become an eye for an eye, tooth for

a tooth person."   Tate explained that, before his incarceration, he

could not read or write very well but that, within the last four years,

his skills in those areas had improved and that he "ha[d] read the

Bible several times."   As a result, he "believe[d] that if you

committed a crime worthy of death that [you] refuse not to die."

Then he stated:

> That's how I am.  I'm refusing not to die.  I'm given [sic] the opportunity that I have taken from the family.  I've taken two lives from the family — I have taken one life and I have been a party to taking another.  And I believe that they should have the same opportunity.

The trial court stated that it had "a pretty good guess what

[sentence Tate was] looking for based upon a few statements [that

he had] made."  The trial court then discussed with Tate his decision

to waive a jury trial as to sentencing and expressed concern that Tate's choice to have an individual rather than twelve persons make the sentencing determination might be the result of his belief that "the twelve wo[uld]n't make the decision that [he] want[ed]." Tate assured the trial court that he considered the court fair and capable and that he was comfortable with the possibility of receiving any of the three possible sentencing options, explaining, "What I believe I should get is one thing, and what I get is another." The trial court responded by opining that it should have stated that perhaps Tate was concerned that a jury would not recommend the sentence that he thought he should receive and not, as the court stated, the sentence that he "want[ed]." However, Tate disagreed, stating: "No. Let's stick with want. We'll stick with want." Then he reiterated, "Yes, sir. We'll stick with want." Thus, Tate clearly stated that, although he recognized that the decision as to what sentence he received was for the trial court and that he would accept that decision, he *wanted* what he felt was the appropriate sentence for his crimes, which was the death penalty.

38

In closing argument at the sentencing trial on December 2, 2005, trial counsel told the trial court that Tate "believe[d] the death penalty [wa]s the appropriate punishment in this case." At his sentencing 17 days later, Tate confirmed that the trial court had just sentenced him to death and then asked if a direct appeal in his case was "automatic." When the trial court answered in the affirmative, Tate indicated that he wished to be appointed counsel for purposes of the "automatic" appeal but stated that, if it were not "automatic," he would not want to appeal.

Finally, at a June 30, 2009 status conference on Tate's motion for new trial, Tate stated that he did "not wish to proceed with a motion for new trial at all [and] ha[d] let this be known back when [the trial court] sentenced [him] to death." Tate told the trial court that he did not "wish to die," as it was against human nature to want to die.[9] However, Tate explained that, as he had told the court from

---

[9] Tate argues that his statement to the trial court that he did not wish to die refutes the habeas court's factual finding that he wanted to receive the death penalty. However, when Tate's statements regarding his sentence are viewed as a whole, they clearly convey that Tate wanted the death penalty

39

the beginning, he "fully and willingly submit[ted] to any sentence that [the trial court] g[a]ve [him]" and that the death sentences that the trial court had imposed were the appropriate punishment for his "horrible, heinous, malicious, and . . . planned out act[s]." Tate also told the trial court the following:

> I wanted to file, to just plead guilty to what I've done, to allow the sentence to be carried out.
> And Mr. Cella, he has completely refused any and all things that I've asked to do. *I wanted to forego — I wanted to just leave out any mitigating evidence and all.* I had no problem with that. And I have only recently come across the actual law cases, you know, with my limited reading skills and limited knowledge in the law. I did not know that it was right that I could just forego all of this.

(Emphasis supplied.) Reed corroborated Tate's assertion that he told trial counsel at trial to leave out all mitigating evidence, both at the time that Tate made the assertion at the status hearing on the motion for new trial and twice in the habeas proceedings.[10]

---

because he felt that it was the appropriate sentence for his crimes and *not* because he wanted to die.

[10] Tate argues that Reed's statement at the 2009 status hearing was made in the context of disputing and not agreeing with Tate's claims. While Reed did try to explain Tate's claims to the trial court, he did not dispute

Accordingly, in light of the evidence in the trial and habeas records, we conclude that the habeas court's factual findings that, "following trial counsel's attempts to negotiate a plea, [Tate] expressed a desire to plead guilty, did not want trial counsel to present mitigation evidence, and wanted to receive the death penalty" are not clearly erroneous. See *Johnson,* 282 Ga. at 602 ("When there is evidence to support the habeas court's factual findings, those findings cannot be found to be clearly erroneous."). Accordingly, this Court must accept them.

Nevertheless, Tate argues that trial counsel's testimony shows that he was only opposed to trial counsel's presenting evidence regarding his molestation as a child by his older brother,

---

outright any of those claims. Specifically with regard to Tate's claim about mitigating evidence, Reed stated: "[Tate]'s also said that — he told me and Mr. Cella at trial to leave out all mitigating evidence. But I had conversations with Mr. Tate *subsequent* to the trial, and he and I talked about *other* things different than — that *he did express some concern about what did go on at trial*." (Emphasis supplied.) While the meaning of Reed's statement is somewhat unclear, after being directed to it, Reed affirmed at both his deposition and at the habeas evidentiary hearing that Tate told him and Cella at trial to leave out all mitigating evidence.

41

Curtis Tate, and putting his mother on the stand as a witness and that he was "ambivalent" about the presentation of any other mitigation evidence and cooperated with trial counsel.[11] To support this argument, Tate relies in several instances on trial counsel's testimony describing Tate's attitude early in his case before he had a change of attitude or on counsel's testimony before their memories were refreshed as to what actually occurred in the trial proceedings. As to trial counsel's descriptions of Tate as "cooperative," Reed

---

[11] Even assuming arguendo that Tate were correct here, trial counsel would have still been foreclosed from pursuing and presenting this mitigating evidence. Therefore, any evidence regarding Tate's molestation by Curtis Tate or any testimony by Tate's mother could not have been presented at the sentencing trial, nor could trial counsel have pursued any mitigation defense that relied on this evidence. Consequently, it would be error to consider in the prejudice analysis any direct evidence about Curtis Tate's molestation of Tate and any direct evidence that would have come solely through the testimony of Tate's mother, as discussed in subdivision (C) (4) (a) below. See *Barrett v. State,* 292 Ga. 160, 187 (3) (D) (733 SE2d 304) (2012) (assuming trial counsel were deficient in failing to present certain types of mitigating evidence but refusing to consider in the prejudice analysis the type of mitigating evidence that counsel discussed presenting with the defendant but that the defendant instructed counsel not to present); *Gilreath v. Head,* 234 F3d 547, 550 n.10 (11th Cir. 2000) (same). It would also be error to consider in the prejudice analysis any such evidence indirectly as the basis for expert mental health testimony regarding the underlying causes for Tate's mental disorders and drug use and abuse, as discussed in subdivision (C) (4) (b) below. See *Leonard v. State,* 269 Ga. 867, 870 (506 SE2d 853) (1998) (stating that an expert may be examined about the hearsay upon which his opinion rests in order to allow the trier of fact to evaluate the opinion).

explained that, when he described Tate as "cooperative," he meant that Tate was "pleasant"; however, Tate's religious views still affected "the way that [trial counsel] presented evidence in the penalty phase and [Tate] not letting [counsel] — not wanting [counsel] to do certain things." Cella testified that he would not describe Tate as ever being uncooperative, because, "even though [they] had disagreements, [they] were always able to discuss them in a civil tone." Cella then testified that the "only" disagreements that he and Tate had concerned Tate's wanting the death penalty. Even if portions of trial counsel's testimony appear somewhat at odds with other testimony and evidence, it was for the habeas court to resolve any conflicts. See *Waye v. State,* 239 Ga. 871, 876 (2) (238 SE2d 923) (1977) ("It is the job of the trial court to resolve any conflicts in the evidence when serving as a trier of fact."). As our review of the evidence above shows, the record amply supports the habeas court's factual findings.

Tate also argues that *Landrigan* and related cases are inapplicable, because, unlike the defendant in *Landrigan,* he never

43

stated on the record at trial that he had instructed trial counsel not to present mitigation evidence and because he allowed trial counsel to present some mitigation evidence and to argue for a sentence other than death.  See *Landrigan,* 550 U. S. at 476 (III) (A) (noting that Landrigan "informed his counsel not to present any mitigating evidence" in the plea colloquy before the trial judge and that he "interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating").  Thus, Tate argues that he was merely "fatalistic" and that his case was one of "passive non-cooperation." See id. at 478 (III) (B) (1) (distinguishing *Landrigan* from the defendant in *Rompilla v. Beard,* 545 U. S. 374, 381 (II) (A) (125 SCt 2456, 162 LE2d 360) (2005), who "refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented").  However, at the guilty plea hearing, Tate clearly explained the rationale behind his desire for the death penalty, and Cella reminded the trial court in closing argument at the sentencing trial that Tate wanted the death penalty before he stated that he disagreed with his client that a

death sentence was the appropriate sentence and gave his reasons why.

Moreover, trial counsel's habeas testimony reflects that Tate's instructions to counsel regarding mitigation evidence were based on his strong religious beliefs that led him to decide that the death penalty was the only appropriate sentence for his crimes and that he could not be dissuaded from that decision, despite trial counsel's best efforts. Furthermore, at the status hearing on his motion for new trial, Tate indicated that Cella had misled him into believing that counsel had to present some mitigating evidence, and Cella's habeas testimony corroborates that he did indeed tell Tate that he had to present at least some mitigating evidence in order to avoid reversal of his sentence on appeal. Also at that hearing, which occurred three-and-a-half years after the sentencing trial, Tate continued to adhere to the belief that the death penalty was the appropriate sentence in his case. See *Cummings v. Secretary for Dept. of Corrections,* 588 F3d 1331, 1366 (III) (D) (11th Cir. 2009) (stating that the fact that the defendant made it clear that he

preferred a sentence of death indicated that he "would not have consented to the presentation of mitigating evidence whose only purpose was to convince the jury to recommend life instead of death"). Tate also withdrew the motion for new trial raising the general grounds filed by counsel, and he refused to cooperate with counsel in filing a direct appeal to this Court. When his brother, Dustin Tate, filed a next friend state habeas petition on Tate's behalf in response to the trial court's order scheduling Tate's execution in 2012, Tate successfully moved to dismiss it. Only on the day of his scheduled execution did he file his own state habeas petition. However, at the habeas evidentiary hearing, he filed a pro se pleading entitled "Motion to Withdraw Filings and Termination of Appeals Notice."[12] He also told the habeas court that his habeas petition had no merit and that he intended to have nothing more to do with habeas counsel, and he asked to be excused from the

---

[12] Although Tate also indicated in his motion that he wished to abandon further legal representation, there is no indication in the record whether he persisted in his desire to dismiss counsel. Moreover, neither the habeas court's denial of Tate's pro se motion nor the matter of his representation has been raised in his cross-appeal.

hearing. While Tate's instructions to trial counsel may not have been "as strident, public, or obstructive as those in *Landrigan,* the record here evidences something more resolute than a mere instruction not to present mitigation evidence." *Loden v. McCarty,* 778 F3d 484, 500 (IV) (A) (5th Cir. 2015).

All of the foregoing certainly support a conclusion that Tate's decision regarding the presentation of mitigating evidence was a considered one and that his instructions to counsel regarding mitigating evidence were fixed and unyielding at the time of trial. Therefore, we reject Tate's argument here. See *Loden,* 778 F3d at 500 (IV) (A) ("*Landrigan* states only that the defendant's actions in that case were *sufficient* to preclude a showing of prejudice; it does not speak to what actions are *necessary* to bar such a showing." (emphasis in original) (citing *Landrigan,* 550 U. S. at 475-477 (III) (A))). See also *Landrigan,* 550 U. S. at 477 (III) (A) ("In the constellation of refusals to have mitigating evidence presented . . . this case is surely a bright star. No other case could illuminate the state of the client's mind and the nature of counsel's dilemma quite

47

as brightly as this one." (citation and punctuation omitted)); *Newland v. Hall,* 527 F3d 1162, 1205 (V) (A) (5) (11th Cir. 2008) (concluding that, while the defendant's conduct was not as extreme as the conduct of the defendant in *Landrigan,* the court still followed *Landrigan* by "drawing a distinction between a defendant's passive non-cooperation and his active instruction to counsel not to engage in certain conduct").

Nevertheless, despite our conclusion that the habeas court's factual findings that Tate did not want trial counsel to present mitigation evidence and that he wanted to receive the death penalty are *not* clearly erroneous, we are convinced that a proper analysis of Tate's case requires more than simply applying those factual findings to the legal principle in *Landrigan* that "a defendant who refuse[s] to allow the presentation of any mitigating evidence [can]not establish *Strickland* prejudice based on his counsel's failure to investigate [and present] further possible mitigating evidence." *Landrigan,* 550 U. S. at 478 (III) (B) (1); see id. at 477 (III) (A). Although the *Landrigan* Court stated that the Supreme Court

48

"ha[d] never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence," the Court nonetheless *assumed* "that an 'informed and knowing' requirement exist[ed] in [Landrigan's] case" and concluded that Landrigan could not benefit from it for multiple reasons. Id. at 479-480 (III) (B) (2). Significantly, *Landrigan* involved the highly deferential review of state court proceedings under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[13] Thus, the issue in *Landrigan* was whether the Supreme Court had *previously* held that a defendant's decision not to present mitigating evidence must be knowing and voluntary, not whether it *would* so hold if that question were presented to it.

A survey of case law shows that, both before and after

---

[13] Under the AEDPA, reversal of a state court's adjudication is permitted only if that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 USCA § 2254 (d).

*Landrigan,* many courts have applied some sort of "informed and knowing" requirement, either expressly or implicitly, when evaluating the effect of a defendant's refusal to allow the presentation of mitigating evidence. See *Brawner v. Epps,* 439 Fed. Appx. 396, 404 (I) (D) (5th Cir. 2011) (noting that the Supreme Court "declined to establish a standard to evaluate a defendant's waiver of the presentation of mitigating evidence in *Landrigan*" but reviewing the defendant's "statements to confirm that he was competent and that his wishes were consistent, knowing, and voluntary"); *Blystone v. Horn,* 664 F3d 397, 423-426 (IV) (B) (2) (3d Cir. 2011) (concluding that the state court unreasonably concluded that the facts demonstrated that the defendant made a "'knowing, intelligent, and voluntary[ ]' waiver of his right to present *any* mitigating evidence at sentencing" and holding that *Landrigan* was distinguishable); *Coleman v. Mitchell,* 268 F3d 417, 447-448 (VII) (6th Cir. 2001) (stating that trial counsel may not have been ineffective, "[i]f the record [had] indicated a clear, informed assertion by [the defendant] that he did not wish his counsel to present any mitigation evidence

50

in [his] behalf"); *Emerson v. Gramley,* 91 F3d 898, 906-907 (7th Cir. 1996) (holding that a defendant's waiver of the right to present mitigating evidence was not consistent with effective assistance of counsel, where the defendant was not informed about the possibilities of mitigating evidence and where he was not warned of the consequences of the decision).  Cf. *Allen,* 611 F3d at 763-764 (IV) (noting in reviewing a state court decision under the AEDPA that *Landrigan* foreclosed the argument that a defendant's waiver of a mitigation case should be deemed invalid because, due to lack of investigation, counsel failed to inform the defendant of the evidence that he was giving up, but nonetheless explaining why the defendant's waiver was knowing and intelligent).

Exactly what an informed and knowing requirement entails in the context of a defendant's refusal to allow the presentation of mitigation evidence varies among jurisdictions.  However, we can glean from *Landrigan* and cases applying it certain factors that, if an informed and knowing waiver of mitigating evidence *were* constitutionally required, would be considered.  Those factors

51

include whether the record reflects that the defendant understood that he had the right to present mitigating evidence and whether he understood the *general* nature of the mitigating evidence available to him and the consequences of failing to present such evidence.  See *Landrigan,* 550 U. S. at 479-480 (III) (B) (2) (noting that Landrigan's counsel "had carefully explained to Landrigan the importance of mitigating evidence," especially in a death penalty case, and had explained that counsel had a duty to disclose mitigating factors to the court for consideration in sentencing); *Krawczuk v. Secretary, Florida Dept. of Corrections,* 873 F3d 1273, 1296 (VII) (D) (11th Cir. 2017) (pointing out that trial counsel had advised the defendant of the importance of mitigation evidence and that the defendant possessed a report containing details of possible mitigating evidence); *Allen,* 611 F3d at 761, 764-765 (IV) (stating that the defendant's statements and the trial court's inquiry indicated his understanding of the consequences of waiving mitigation).

However, as the Eleventh Circuit Court of Appeals has pointed out, "no Supreme Court authority post-*Landrigan* indicat[es] that a

competent capital defendant's decision not to present any mitigating evidence may be informed or knowing only if trial counsel first thoroughly or evenly adequately investigates the mitigating evidence and tells her client about it." *Krawczuk,* 873 F3d at 1300 (VII) (F) (rejecting the defendant's argument that his waiver of the opportunity to present mitigation evidence was not sufficiently informed and knowing because his attorney conducted only a limited pre-waiver investigation of mitigating evidence). Nor does our own case law support a requirement that trial counsel must *fully* investigate and discuss *all* the specifics of potential mitigation with the defendant in order for the defendant to be sufficiently informed for the purpose of making a knowing decision not to present mitigating evidence. See *Mize v. State,* 269 Ga. 646, 656 (12) (501 SE2d 219) (1998) (rejecting Mize's claim that the trial court erred in allowing him to prevent the introduction of mitigating evidence at his death penalty trial, stating that "Mize's lawyers, despite Mize's resistance, conducted *some* investigation of Mize's background and informed Mize about pursuing a mitigation defense[, b]ut the final

53

decision about the defense belonged to Mize" (emphasis supplied)).

Finally, although the issue was not explicitly addressed in *Landrigan,* courts have also said that counsel may not defer to a defendant's instructions to forego or severely limit mitigating evidence when there is evidence that the defendant is not competent to make such a decision. See, e.g., *Allen,* 611 F3d at 764-765 (IV); *Cummings,* 588 F3d at 1361 (III) (C). This Court has also said that a defendant must be competent in order to make such a decision, and we have stated that such a decision must be "informed." See *Mize,* 269 Ga. at 656 (12) (holding that allowing a capital defendant to preclude his lawyers from presenting mitigation evidence was not error, where the record showed that his lawyers conducted some investigation of his background and informed him about pursuing a mitigation defense and where the record also showed that the defendant was competent and understood his decision); *Morrison v. State,* 258 Ga. 683, 686 (3) (373 SE2d 506) (1988) (explaining that, while "the defendant, and not his attorney, makes the ultimate decision about . . . whether or not to present . . . mitigation

[evidence]," that decision must be made by an informed and competent defendant in order to be valid). However, we have never explained the extent to which a defendant must understand the nature of the mitigating evidence available to him in order for his decision not to present mitigation evidence to be valid. Nevertheless, this case does not require us to decide that issue because, as the following discussion shows, Tate clearly understood the general nature of the mitigating evidence available to him before his sentencing trial. Therefore, any standard that this Court might adopt is easily satisfied here.

We now review the record in Tate's case in subdivisions (C) (4) (a), (b), and (c) below, assuming that a decision not to present mitigation evidence must be an informed and knowing decision under the general factors discussed above, i.e., the defendant understood that he had the right to present mitigating evidence and understood the consequences of failing to present such evidence and the general nature of the mitigating evidence available to him. Upon doing so  we conclude that, even in light of Tate's habeas

evidence, Tate was competent and made an informed and knowing decision not to present mitigating evidence at his sentencing trial. Therefore, as we conclude in subdivision (C) (5), even assuming trial counsel's purported deficiencies with regard to investigating and presenting mitigating evidence, Tate cannot establish *Strickland* prejudice as a result. See *Landrigan,* 550 U. S. at 477 (III) (A), 478 (III) (B) (1). Accordingly, his ineffective assistance of counsel claim must fail. See *Strickland,* 466 U. S. at 697 (IV) (noting that an appellate court need not address counsel's performance if the claim can be rejected based on a lack of prejudice); *Lajara v. State,* 263 Ga. 438, 440-441 (3) (435 SE2d 600) (1993) (same).

2. *Tate's Competency.*

As further discussed below, Tate was evaluated twice during his trial proceedings, the last time two months before his sentencing trial, and he was found competent both times.[14]

---

[14] The habeas court rejected Tate's claim that trial counsel were ineffective in providing Dr. Richards with background information and details regarding the alleged source of Tate's religious views for the purpose of evaluating Tate. As discussed in subdivision (D) below, we find no merit to Tate's claim on cross-appeal that the habeas court erred in rejecting this claim.

56

*3. Tate's Understanding of the Meaning of Mitigation Evidence and His Right to Present Such Evidence.*

Tate's own statements at the guilty plea hearing and at the status hearing on his motion for new trial demonstrate that he understood that he had a right to present mitigation evidence. See *Landrigan,* 550 U. S. at 479 (III) (B) (2) (stating that the Supreme Court had "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence"). Those statements also clearly reflect Tate's understanding that the purpose of such evidence is to convince the sentencer to impose a sentence other than death. See id. (citing the defendant's statement to the sentencing court that, if the court wanted to give him the death penalty, to "just bring it right on" and that he was "ready for it" as evidence that he "clearly understood the consequences of" not presenting mitigating evidence). At the status hearing on the motion for new trial, Tate also stated that "the mitigating evidence [presented at the sentencing trial] did not have no bearings [sic] on the case anyway, because the decision was still

57

capital punishment," further confirming Tate's understanding of the purpose of mitigation evidence. That Tate had such an understanding is corroborated by trial counsel's habeas testimony that "[their] hands were tied" with regard to presenting mitigation evidence, because at the time of the sentencing trial Tate had adopted "the mantra" that he "ha[d] committed a sin worthy of death and he wanted to die."

*4.  Tate's Understanding of the Availability of Possible Mitigation Strategies.*

In evaluating Tate's understanding of the availability of possible mitigation strategies, we review the new evidence that the habeas court faulted trial counsel for not presenting at the sentencing trial regarding (1) Tate's abusive upbringing and his family's mental health history, (2) his psychiatric background and mental disorders through expert testimony, and (3) his drug dependency and drug use leading up to the crimes. [15] We also review

---

[15] Although we need not and do not decide whether trial counsel were deficient in investigating mitigating evidence, see *Lajara*, 263 Ga. at 440-441 (3), trial counsel's actions are relevant to the extent that they show Tate's understanding of the availability of possible mitigation strategies.

what the record shows regarding Tate's general understanding about such evidence, keeping in mind that trial counsel were not required to complete a full investigation before explaining Tate's options to him in order for him to be sufficiently advised to make an informed and knowing decision.

*a. Mitigating Evidence of Abusive Upbringing and Family Mental Health History.*

The habeas court faulted trial counsel for failing to present evidence that "[Tate]'s childhood was characterized by poverty, neglect, incest, and physical, sexual, and emotional abuse." The habeas court described extensively the new habeas evidence regarding Tate's childhood, including the following. When Tate was young, his father worked on an oil rig and was often absent for long periods of time. When he was home, he beat Tate and his siblings regularly with belts, extension cords, and his fists. Tate's mother flew into sudden rages, whipped Tate for wetting the bed, hit Tate and his siblings with her fists, whipped them with belts, routinely yelled at them, called them profane names, berated them, and forced

them to kneel and hold their ankles, sometimes while nose to nose. Tate's parents also fought violently with each other. In 1987, eight-year-old Tate moved with his family from Louisiana to Georgia, and approximately a year later his mother reported to counselors at Three Rivers Behavioral Health ("Three Rivers") that his older brother Curtis had been molesting Tate and his younger siblings. Tate later reported to a social worker that he had been anally raped for a year. According to the Three Rivers records, the Tate children expressed "anger, fear, shame and embarrassment" over the molestation. Tate asked for help in controlling his anger and reported that he had stopped attending school, and he was retained in the second grade. The following year, 17-year-old Curtis Tate was released from a juvenile detention center and again molested Tate and raped his sister, Kim Tate. In 1990, Curtis Tate pleaded guilty to incest and child molestation charges.

In 1991, 11-year-old Tate and his family moved back to Louisiana. Tate's father and sister soon returned to Georgia while the rest of the family remained in Louisiana, where Tate's mother's

boyfriend lived with them. He not only physically abused Tate's mother but also abused Tate and his brothers by force-feeding them, holding them at gunpoint, and forcing them to kneel for 24 to 36 hours at a time on frozen rice scattered on the floor with only bread to eat and water to drink. Tate performed poorly in school and came back to Georgia to live with his father in 1992. He attended school in Paulding County for a few weeks but stopped when he was bullied for having been sexually molested. Following a fistfight with his father in October 1992, the Department of Family and Children Services ("DFCS") received a complaint of child abuse or neglect. After another fight with his father, 13-year-old Tate was committed to Northwest Georgia for 30 days for psychological evaluation.[16] Several months after his release, Tate was sexually molested by his paternal aunt's husband. From adolescence until the time of the

---

[16] According to the evaluation, Tate was "referred for psychological evaluation by court order signed by Judge Tonny Beavers of Paulding County Juvenile Court," who was also the trial judge who accepted Tate's guilty plea and presided over Tate's sentencing trial. The evaluation stated that "[Tate] came to the attention of the court because of truancy, terroristic threats, and use of fighting words" and indicated that the terroristic threats and fighting words were directed at Tate's father.

three brothers' arrests, the Tate siblings also engaged in incestuous acts with each other.

While the habeas court found the above evidence of Tate's abusive upbringing compelling, the record shows that trial counsel were aware of the vast majority of this evidence and discussed presenting it as mitigating evidence with Tate. Trial counsel's billing records show that they met with Tate many times, and counsel testified that, as relevant here, they discussed with Tate his limited education, prior criminal history, sexual abuse, and physical abuse, particularly by his father. Reed testified that Tate was not "always forthcoming," particularly concerning "the home in which he was brought up . . . because it was very difficult for him to talk about." Nevertheless, trial counsel learned about Curtis Tate's sexual abuse of Tate as a child from multiple sources, including Tate's videotaped custodial interview, medical records that they obtained, and Tate himself. Indeed, counsel thought that it would be strongly mitigating evidence and that "[e]verything else pale[d] in comparison."

At the habeas evidentiary hearing, Reed testified that he and Cella had initially considered a mitigation strategy that included "[Tate]'s childhood background, lack of education, no parenting, . . . rampant [drug use], . . . child abuse[, and h]is own brother['s] molest[ation] of him." He also stated that trial counsel discussed calling Curtis Tate and Tate's mother to testify about Curtis's molestation of Tate and calling Dr. Richards to testify "primarily [about] the mental aspects and the sexual abuse aspects of the case." Reed explained, however, that Tate "was adamant that [trial counsel] were not going to call [his mother and Curtis]" and that he did not want that evidence presented. Reed also testified that, while his memory was not as vivid with regard to Dustin Tate and Chad Tate, Tate did not want them to testify for different reasons and thought that he did not want them "to go back through testifying or taking the stand."

Cella testified similarly, stating the following:

> The most vivid memory I have is discussing with [Tate] the impact of the evidence of his older brother Curtis going to prison for a violent sexual attack on [Tate]

when he was a young child. We had a long discussion about how helpful that was and how important for the decision maker — whether it be a judge or a jury to have that information. He was absolutely firm in his order to me that we not go into that. . . . [M]y best recollection is that this was . . . more driven by his desire to receive the death penalty than by embarrassment. . . . I just know that he was extremely firm in telling me there were going to be problems [between him and me] if I tried to bring that up in his trial, so I didn't do that.

Cella also testified that Tate "[a]bsolutely" instructed him not to even investigate "[t]hat particular aspect" of his background. Trial counsel testified that, while Tate did allow the introduction of Curtis Tate's certified molestation conviction at trial, counsel made no reference to the fact that Tate had been molested by his brother in closing argument because Tate "did not want [counsel] to go into that." Cella testified that counsel did not "present anywhere near as much evidence about [the molestation] as [they] would have" if they had not been instructed by Tate to forego it.

Furthermore, counsel had two psychological evaluations conducted on Tate and gathered documents, including Tate's school records and records from his treatments at Northwest Georgia in

64

1993 and 1998. Trial counsel were aware from Dr. Richards's 2003 evaluation that Tate had a learning disability and had left school after the sixth grade and that he reported that he had been the victim "of physical and sexual abuse at the hands of multiple perpetrators," including his brother Curtis. Dr. Richards testified in the habeas proceedings that Tate in fact told him that his mother's boyfriend abused him by putting a gun to his head, beating him with a belt, and making him stay on his knees for 24 to 36 hours at a time. The 1993 Northwest Georgia records, which trial counsel obtained and provided to Dr. Richards and on which Dr. Richards partially relied in conducting his 2005 evaluation, contained the information that "DFCS ha[d] been involved in [sic] this family for several years, because of possible physical abuse by the father as well as the sexual abuse by the brother." According to Cella's billing records, he met with Tate to discuss the contents of both of these reports. Trial counsel also testified that they talked to Tate about sexual and physical abuse in his family and that Tate did not want to present this type of evidence both because of his religious view

that he had committed a sin worthy of death and because of his desire not to put his family through reliving those events.

The habeas court also noted the following evidence presented in the habeas court regarding the mental history of Tate's family. Tate's mother suffered from depression, anxiety disorders, and Post Traumatic Stress Disorder ("PTSD"), was medicated most of her adult life on prescription drugs such as Xanax and Oxycontin, and received psychological treatment at Three Rivers from 1988 until 2001, except for two years when she lived out of state. According to the testimony of her counselor, Tate's mother had mood swings and suicidal thoughts, "was constantly preoccupied with her own issues and seldom seemed concerned for the well-being of her children," "chose to stay in abusive relationships," and reported that her ex-husband and at least one boyfriend were abusive to her and her children and that her brother and mother received mental health services. Aware that Tate had been sexually abused by Curtis, the counselor encouraged Tate's mother to bring him to counseling with her, but Tate never attended. The maternal and paternal sides of

66

Tate's family also had extensive histories of mental disorders, including anxiety, depression, drug dependency, bipolar disorder, and schizophrenia. In particular, Tate's maternal uncle was diagnosed with schizophrenia, was ruled incompetent to stand trial on a bad check charge, sexually molested Curtis Tate, and raped Tate's sister, for which he was charged with incest, and he died after overdosing on prescription medication.[17]

Regarding this evidence, at the very least, trial counsel were generally aware of the history of mental illness in Tate's family from the 1993 Northwest Georgia records. Specifically, the 1993 records contained a psychosocial assessment of Tate that stated that

---

[17] Because this evidence "concern[ed] things that affected [Tate]'s family members, . . . rather than things that would have directly affected [Tate]," it would not have been significantly mitigating on its own. *Whatley v. Terry,* 284 Ga. 555, 566 (V) (B) (668 SE2d 651) (2008). See *Hall v. Lee,* 286 Ga. 79, 90-91 (II) (B) (4) (b) (684 SE2d 868) (2009) (stating that evidence about the "'addiction, dysfunction, and brutality'" of a habeas petitioner's family that did not directly affect the petitioner would not have been significantly mitigating). The principal value of this testimony lies in its support of Tate's habeas experts' mental health testimony that Tate was genetically predisposed to psychiatric disorders such as drug dependency, depression, anxiety, and symptoms of paranoia. As the discussion in the following subdivision shows, Tate also clearly understood the availability of a mitigation strategy based upon his psychiatric background and mental disorders through expert testimony.

"[s]everal" of Tate's paternal uncles and his maternal great-grandmother and grandmother had been diagnosed "manic-depressive" and that Tate's paternal uncle committed suicide. Trial counsel testified that they discussed Tate's family mental health history with him. Therefore, the record shows that Tate clearly understood the availability of a mitigation strategy based upon his abusive upbringing and his family's mental health history.

b. *Mitigating Expert Evidence Regarding Tate's Psychiatric Background and Mental Disorders.*

The habeas court faulted trial counsel for not presenting "mitigating evidence of [Tate]'s psychiatric history and mental illness" through expert mental health testimony like the following testimony that Tate presented in the habeas court. Dr. Frederic Sautter, a psychologist specializing in trauma, and Dr. Bushan Agharkar, a forensic psychiatrist, reviewed the records and the "biopsychosocial assessment" of the mitigation specialist retained by habeas counsel that was based, among other things, on interviews with Tate's family members and records regarding Tate, including

68

court records and testimony in Tate's trial proceedings.[18]  Based on their review, both experts opined that Tate exhibited symptoms consistent with Complex PTSD, an especially severe form of PTSD that may be present in a victim who has been exposed to chronic or repeated trauma in the past, particularly in childhood and adolescence.[19]  Dr. Sautter testified that Complex PTSD "has a powerful and pervasive impact on the traumatized person's ability to control [his] thoughts, emotions, and behaviors in situations that make [him] threatened or ashamed."  Both experts recommended that neuropsychological testing be performed on Tate, which was conducted by Dr. Robert Shaffer.  As the habeas court found, based on that testing, Dr. Shaffer concluded that Tate suffers from significant brain damage of the sort that "would [cause him to] have

---

[18] Dr. Agharkar also interviewed Tate.

[19] Both experts cited Tate's traumatic childhood of physical and sexual abuse, particularly his repeated sexual abuse by his brother Curtis, as significant to this diagnosis.  Another of Tate's habeas experts, Dr. Bekh Bradley, a psychologist, testified that, although Complex PTSD is not listed in the Diagnostic and Statistical Manual of Mental Disorders, "[i]t was an available syndrome or set of symptoms" at the time of Tate's sentencing trial in 2005.

trouble conforming [his] behavior appropriately where a situation changed in an unanticipated manner."

Dr. Pablo Stewart also evaluated Tate in order to assess his drug and alcohol history and its impact on his mental state and functioning in light of his trauma history. He opined that Tate's family history predisposed him to drug dependence, that Tate did in fact suffer from "chronic drug dependence," and that Tate's drug use was a reaction to the "extraordinary amount of incest, physical abuse, and psychological and emotional abuse" that he had experienced throughout his childhood. According to Dr. Stewart, "[Tate's] drug usage began wholly as an effort to self medicate for the serious depression, extreme anxiety, and feelings of shame" that resulted from his traumatic upbringing and sexual abuse. Dr. Stewart explained that Tate's "underlying organic brain deficits made him particularly vulnerable to the damaging effects of the relentless abuse he experienced and left him with few resources to cope with those effects." However, he pointed out that Tate's drug usage "could ultimately only exacerbate both [Tate's] underlying

70

cognitive impairments and his mental health symptoms." Specifically with regard to Tate's report that he had been using various drugs leading up to and at the time of the offenses, Dr. Stewart opined that this drug use "diminished Mr. Tate's ability to control his impulses, to think clearly, and to cope with a chaotic and downward spiraling situation, especially after his brother Chad killed the child," and that it was "unlikely that the situation would have occurred without the substance abuse."

While the habeas court found the expert mental health testimony convincing, given that Tate wanted no mitigation evidence presented and wanted the death penalty, the question here is what the record reflects regarding Tate's general understanding of the availability of such evidence as possible mitigating evidence. So viewed, the record shows that the trial court's order in 2003 included a direction to Dr. Richards to evaluate Tate for "any mitigating factors regarding [his] mental status" at the time of the crimes. As the habeas court found, Tate told Dr. Richards about his mental health history, the rapes by his brother, and his abuse by his

71

mother's boyfriend and his father. The habeas court also correctly pointed out that in his 2003 report, Dr. Richards opined that drugs and alcohol had "likely impaired [Tate's] judgment" at the time of the crimes, that Tate suffered from an anxiety disorder, and that Tate had "an unusual psychological relationship" with his brother. The habeas court found that, according to Dr. Richards, as a result of this relationship, "[Tate] felt his brother was in control, including the period leading up to and the day of the crime[s], and . . . this dynamic contributed to his participation in the crime[s]." Dr. Richards concluded that Tate suffered from "diagnosable mental conditions at the time of the alleged offense[s]," which "would certainly have influenced his behavior greatly and affected his judgment significantly at and around the time of the alleged offenses."

The record also reflects that trial counsel subsequently filed an ex parte motion for funds to retain the services of an independent psychologist and psychiatrist and that, at the ex parte hearing on that motion, Cella informed the trial court that, although Dr.

72

Richards was employed by the State, he was "somebody that [Cella] ha[d] worked with in the past and ha[d] a lot of respect for, and [that] his report provided information that [trial counsel] fe[lt wa]s going to be helpful to [the defense] in the sentencing trial."  As the habeas court noted in its order, Cella explained to the trial court that, for mitigation purposes, counsel were particularly interested in the information in Dr. Richards's report regarding "the combination of drugs and alcohol abuse, along with this pathological relationship that [Tate] had with his brother, and those two forces affecting his judgment."  Cella asked the trial court to reserve ruling on this motion until he could "talk to Dr. Richards and find out how qualified he [wa]s to support that conclusion that he drew" regarding "how substance abuse affects one's brain and, therefore, one's judgment."[20]  In addition, Cella testified in the habeas proceedings

---

[20] The habeas court found that, "[o]ver the next twelve months [following the trial court's grant of Cella's June 29, 2004 request to reserve ruling on the motion for funds to retain the services of a psychologist and a psychiatrist], counsel's billing records d[id] not reflect any work on the case, other than speaking with [Tate] twice in December of 2004, until August of 2005."  The trial court orally granted Cella's request to reserve its ruling on this motion at

that, while he did not have "any particular memory of any individual conversations that [he and Tate] had after th[e 2003] evaluation," he was "sure" that such conversations took place. Cella's testimony is supported by his billing records showing that he reviewed Dr. Richards's 2003 report and had multiple telephone conferences with him about his findings and then spent almost three hours discussing

the hearing and asked Cella to prepare the proposed order, and the printed date on the order is June 29, 2004. Cella's billing records indicate that he began work on this issue before the trial court actually filed the signed order on July 23, 2004. Specifically, Cella's billing records show that, from July 1, 2004, to July 31, 2005, he billed almost 40 hours, including a July 2, 2004 telephone conference with Dr. Richards and a three-and-three-quarters-hour conference with Tate on July 9, 2004. Among other matters, Cella also billed for a telephone conference with Tate on August 15, 2004, five hours spent "[c]onferenc[ing] w[ith the] client, co-counsel, [and] view[ing] evidence [at the] jail" on August 17, 2004, a half-hour telephone conference with Tate and co-counsel on December 7, 2004, and a three-and-one-half-hour conference with Tate and co-counsel on the following day. Reed's billing records show that, during that same time period, he billed over 80 hours. Regardless of when the habeas court began its twelve-month count, its factual finding here is not supported by the evidence. However, there is a gap in billing for both attorneys between mid-December 2004 and mid-July 2005. As noted by the habeas court, in early 2005, both a new trial judge and a new district attorney came on the case. On July 5, 2005, the newly assigned trial judge entered an order scheduling Tate's trial for October 24, 2005. On August 23, 2005, the trial court entered an order prepared by Cella ordering Tate's second evaluation by Dr. Richards. Moreover, while Reed testified that he thought that all of his work on the case was reflected in his billing records, Cella testified that his billing records represented the minimum number of hours that he worked on Tate's case, because he was "just not a real good record keeper, as far as [his] time."

with Tate the report and its "impact on defense issues."

As previously discussed, when trial counsel were unable "to talk [Tate] out of his plan to seek the death penalty," they arranged for Dr. Richards to conduct a second evaluation of Tate to determine whether he was competent to enter a guilty plea. At that time, according to Dr. Richards's habeas testimony, trial counsel provided him with Tate's 1993 and 1998 Northwest Georgia records, and Cella's billing records reflect that he attended Dr. Richards's interview of Tate on August 24, 2005. As relevant to Tate's mental health, the 1993 Northwest Georgia records of Tate's admission at age 13 years included a psychological evaluation of Tate. The evaluator did not make a definitive diagnosis of Tate but stated that major depression and an adjustment disorder should be ruled out. The evaluator also reported that Tate made statements "suggestive of grandiosity and paranoia, possibly delusional," and that he might show "distorted thinking patterns [and] poor judgement [sic] and decision-making" when dealing with "ambiguous or emotionally charged situations." The records from Tate's 1998 involuntary

75

admission to Northwest Georgia show that he was discharged after staying one night following his overdose on pain pills. According to the discharge summary, 18-year-old Tate tested positive for marijuana but "d[id] not report any abuse of alcohol or drugs," and the evaluator wrote that Tate "tend[ed] to minimize and deny the extent of his marijuana use." However, the evaluator found that Tate had "good insight into his problems and good judgment" and had "no hallucinations, delusions or other symptoms of psychotic illness." His discharge diagnoses were cannabis abuse and a sprained ankle, and his prognosis was "[g]uarded, based upon [his] abstinence from substance abuse." In his 2005 report, Dr. Richards concluded that Tate did "not currently suffer from any significant mental illness." While he noted that Tate had exhibited psychotic symptoms in the past, he "believ[ed] these were primarily related to heavy drug use."

Again, billing records show that Cella had multiple telephone conferences with Dr. Richards regarding this report and discussed its findings with Tate. Moreover, while Cella initially testified that

he did not do anything with the 2003 report because it was not "particularly helpful," after having his memory refreshed by reading a copy of the transcript of the motions hearing and his billing records, Cella testified that he recalled having conversations with Dr. Richards about his possible testimony based on the report. Dr. Richards likewise testified that trial counsel discussed with him "possible testimony in the penalty phase centered on the issues of Mr. Tate's pathological relationship with Dustin and his drug use[, b]ecause [his] understanding of the theory of the case at the time was that the defense was going to primarily, at least in part, be that Dustin was really the person driving . . . the entire incident and talking about what the impact of [Tate's] drug use might have been."

Furthermore, Cella's billing records indicate that on November 2, 2005, he billed three-and-a-half hours for time spent working on "[p]sychological [i]ssues" in preparation for the sentencing trial, and, as the habeas court noted in its order, Cella indicated to the trial court at Tate's guilty plea hearing that the defense would be presenting evidence of the relationship between Tate and Dustin

77

Tate at the sentencing trial. Cella confirmed in his habeas testimony that, at least at the time of the guilty plea hearing, he intended to present Dr. Richards's testimony, and the record reflects that trial counsel prepared a witness subpoena for Dr. Richards and that their investigator personally served him with that subpoena on November 10, 2015, five days before Tate entered his guilty plea. While Cella could not recall why Dr. Richards was not called as a witness at Tate's sentencing trial, he testified that he did recall that Tate did not want mental health evidence presented. Reed testified that, although he could not "recall specifically," he did "know that there was some fear" that Dr. Richards's testimony would violate the limitations that Tate had put on trial counsel regarding mitigation. Trial counsel's testimony indicates that counsel discussed presenting this evidence with Tate.

Accordingly, based on all of the foregoing, we conclude that Tate understood the availability of a mitigation strategy involving his psychiatric background and mental disorders through expert mental health testimony.

c. *Mitigating Evidence of Drug Dependency and Drug Use Leading Up to the Crimes.*

The habeas court faulted trial counsel for not presenting evidence of Tate's history of drug use and abuse, including the information that Tate began using marijuana and alcohol at approximately age 12 years and that between ages 14 and 15 years he became "a regular drinker" and began to use drugs that eventually included methamphetamine and a variety of prescription "downers" and "painkillers" that he obtained from his mother and his sister. The habeas court also noted the information in Dr. Richards's 2003 evaluation that Tate stated that he began using drugs because of his sexual abuse and that he constantly "stayed on dope" prior to his arrest. In addition, the habeas court pointed out the allegedly new habeas evidence in Tate's 1998 records from WellStar Paulding Hospital where he was treated for his pain pill overdose prior to his involuntary admission to Northwest Georgia, which "show[ed] two suicide attempts over [a period of] two weeks from overdosing." Finally, the habeas court noted the habeas

79

testimony describing Tate's "overwhelming anxiety," extreme fear of being in public, "increasing use of drugs," acts of self-mutilation, and rising stress "closer to the time of the crimes as [Tate] had pressure from his family to pay bills and keep [his father's logging] business going, combined with his drug use."

However, the record reflects that trial counsel were well aware of the vast majority of this information and discussed the possibility of using his drug history as mitigation evidence with Tate. Tate disclosed in his custodial interview that one of his objectives in burglarizing the Williams home was to steal drugs from his drug dealer and that he had used drugs shortly before and after the crimes. In addition, trial counsel learned that Tate had abused drugs and alcohol from a young age through conversations with Tate, the Northwest Georgia records, and the evaluations conducted on Tate. Specifically, Dr. Richards's 2003 report stated that Tate reported "that he was using alcohol by age eleven" and that "he began using marijuana at age ten and ha[d] used cocaine, crank, speed, ice, heroin and Ecstasy." Tate also reported that "he used

whatever he could get every day," that he had in the past supported his habit by selling drugs, and that he "was drinking 'all night' the night before [the crimes,] and . . . had been using ice, marijuana and crank at the time of the alleged offense[s]."

As to the information that the habeas court cited regarding Tate's two suicide attempts in a two-week period in 1998, Dr. Richards stated in his 2003 report that Tate had reported that "he ha[d] tried to kill himself three or four times by taking drug overdoses, putting a gun in his mouth, which then misfired, and cutting his wrists superficially." However, Dr. Richards reported that Tate "denied any current suicidal ideation, plan or intent." With respect to the habeas testimony that Tate suffered from "overwhelming anxiety" and a fear of being in public, in his 2003 evaluation Dr. Richards opined that Tate "appear[ed] to suffer from an anxiety disorder . . . akin to an agoraphobic disorder, where he ha[d] difficulties with large crowds and large spaces." As discussed above, Cella's billing records show that he discussed Dr. Richards's 2003 report with Tate, and trial counsel also testified that they

81

discussed with Tate his history of alcohol and drug abuse and considered using it as mitigation evidence.

The record also shows that trial counsel sought funds for a pharmacologist to develop information showing how Tate's extensive drug abuse at a young age affected him. However, according to Cella's testimony, Tate was not "real happy about pursuing" this avenue of potential mitigation, and Reed testified that, because of Tate's belief that he had "committed a sin worthy of death," counsel had "no other option" but to refrain from presenting evidence involving his history of drug and alcohol use at the sentencing trial.[21] Moreover, Tate told the trial court at his guilty plea hearing that he believed that his drug use at the time of the

---

[21] Cella also testified that he was ordinarily "a bit ambivalent about" presenting evidence of a defendant's drug use, because "half the population finds this mitigating; the other half finds it aggravating" and that, thus, he considered it "an area that's fraught with peril." However, as discussed in subdivision (b) regarding mental health testimony above, both the trial and habeas record show that trial counsel considered using evidence of how Tate's drug use affected his judgment at the time of the crimes. See *Cooper v. Secretary, Dept. of Corrections,* 646 F3d 1328, 1355 (III) (A) (2) n.20 (11th Cir. 2011) (acknowledging that evidence of alcoholism and drug abuse can be "'a two-edged sword'" but crediting "evidence of alcohol abuse beginning at age 11 as mitigation, as it was used as a way to escape [the defendant's] horrible background").

crimes had been used to explain his actions but that he did not think that it had any bearing on his judgment and that he did not want to use his drug abuse as a "crutch." In closing argument at the sentencing trial, Cella told the trial court that, before he proceeded to tell the court why he disagreed with Tate that a death sentence was the appropriate punishment in his case, he had "promised [Tate] that [he] would remind the court about some things that [Tate] said at his guilty plea," including Tate's "'refus[al] to use drugs as a crutch or an excuse.'" All things considered, we conclude that Tate had an understanding of the availability of a mitigation strategy based upon his history of drug dependency and drug use leading up to the crimes.

*5. Conclusion.*

Based on all of the foregoing, we conclude that Tate was competent and made an informed and knowing decision when he instructed trial counsel not to present mitigating evidence at his sentencing trial. Therefore, even assuming that trial counsel were deficient in investigating mitigating evidence, he cannot establish

that, but for trial counsel's alleged deficiencies in that regard, a reasonable probability exists that the outcome of his sentencing trial would have been different. Accordingly, he has failed to establish *Strickland* prejudice. See *Krawczuk,* 873 F3d at 1295-1296 (VII) (C), (D) (holding that the defendant could not establish *Strickland* prejudice, where the defendant's rejections of his counsel's attempts to present mitigation evidence "were not taken in ignorance" in that counsel had advised him of the importance of mitigation evidence, including discussing with him a psychiatric report containing details of his "abusive childhood, military psychiatric report, and past encounters with the law"). See also *Brawner,* 439 Fed. Appx. at 407-408 (I) (D) (considering the fact that a competent defendant's "wishes [to receive the death penalty] remained the same for over three years, throughout pre-trial, direct appeal, and state habeas proceedings," in finding that his decision to forego the presentation of mitigation evidence at his death penalty trial was knowing and voluntary). Compare *Blystone,* 664 F3d at 426 (IV) (B) (2) (holding that the state court unreasonably determined that the defendant

84

waived *all* mitigating evidence and thus could not show *Strickland* prejudice, where the record did not reflect that he "understood that any form of evidence other than lay witness testimony could have been offered in mitigation" and did not show "that [trial counsel] ever discussed with [the defendant] the possibility of considering" other types of available mitigation, including expert mental health evidence).

D.  *Ineffective Assistance of Counsel Claim Regarding Tate's Guilty Plea.*

In his cross-appeal, Tate contends that the habeas court erred in denying his claim that trial counsel were ineffective in allowing him to plead guilty, because he was not competent to enter a guilty plea.  As discussed above, prior to entering his plea, Tate was twice evaluated and found to be competent by Dr. Richards.  Nevertheless, Tate argues that trial counsel did not provide Dr. Richards with all of the relevant documents necessary to make such a determination.  To support this claim, Tate relies on Dr. Richards's habeas testimony indicating that his 2005 evaluation finding Tate

competent to plead guilty may have been compromised because at that time he did not know whether or the extent to which Tate's decision to plead guilty was influenced by the writings of an allegedly "pro death penalty individual" and did not have Tate's most recent mental health records or complete information about his childhood abuse.

The habeas court found that, "[a]lthough trial counsel did not provide Dr. Richards with as much background information as habeas counsel, Dr. Richards was still aware of much of that information," including some of the childhood abuse and Tate's several suicide attempts. This finding is supported in the record. In fact, Dr. Richards testified that Tate not only told him about Curtis's molestation of him but also about being sexually abused by an aunt and a cousin and about being physically abused by his mother's boyfriend. The habeas court also found that Tate told Dr. Richards about his most recent mental health treatment, which is supported in the record. Dr. Richards also testified that if he felt that he needed additional documents or needed to talk to family members

in order to complete an evaluation, he would typically ask the attorney for assistance. The habeas court found that "[t]he record does not indicate that Dr. Richards requested any additional documents" in Tate's case and that "Cella testified that if Dr. Richards had requested any additional documentation, trial counsel would have provided it." The habeas court's findings are supported in the record, and, based on those findings, the habeas court properly concluded that trial counsel's performance in this regard was reasonable. See *Head v. Carr,* 273 Ga. 613, 631 (4) (C) (7) (544 SE2d 409) (2001) (holding that it is "not reasonable to put the onus on trial counsel to know what additional information would have triggered [an expert] to order [further] testing").

We also agree with the habeas court that Tate failed to show that he was prejudiced. For the 2005 evaluation in which trial counsel sought to have Tate evaluated for competence to enter a guilty plea, Dr. Richards relied on the documents from the 2003 evaluation, which had included Tate's videotaped custodial interview, the autopsy reports for both victims, post-arrest

87

correspondence from Dustin Tate to Tate, a meeting and multiple phone calls with Cella, and two interviews with Tate, during which Tate told Dr. Richards about his several suicide attempts, mental health treatment that he had received, and childhood abuse. In addition to those sources of information, in 2005 Dr. Richards also considered Tate's ten-page manuscript explaining his rationale for possibly entering a guilty plea, his Northwest Georgia records, and an August 2005 interview with Tate.

With regard to Tate's competence to stand trial, Dr. Richards concluded that Tate "understands the nature and object of the proceedings pending against him [and] his condition with regard to the proceedings and [that] he could assist an attorney in mounting a defense." As to his competence to enter a guilty plea, Dr. Richards concluded that "there [wa]s nothing psychologically or cognitively that would impair Mr. Tate in his ability to enter a knowing, intelligent and voluntary plea to the charges pending against him" and that there were no "psychotic symptoms that impair[ed] his contact with reality or his ability to evaluate situations realistically

88

and come to conclusions." Specifically with regard to whether Tate's religious views affected his competence to enter a guilty plea, Dr. Richards found that "[Tate's] beliefs d[id] not constitute a delusion and, while strident, [we]re not outside the realm of what is acceptable, particularly within his religious peer group," and that "[he] appear[ed] to have made a reasonable decision based upon his beliefs as to what his course of action should be with regard to the offense[s that] he [wa]s alleged to have committed."

Dr. Richards testified in the habeas proceedings that, had he been provided the new information showing the extent and pervasiveness of Tate's childhood abuse, Tate's complete mental health history, and the information that Tate read the writings of a "pro death penalty individual," "it very likely would have affected [his] 2005 conclusion that Mr. Tate was competent to plead guilty to capital murder without a negotiated plea for a life sentence." He explained that, due to this lack of information, he never considered a diagnosis of PTSD or Complex PTSD, and, "[h]ypothetically, [he] might have been more comfortable if [Tate] had had a negotiated

89

plea as opposed to opening himself up to the death penalty." However, he refused to state what his conclusion would have been had he been provided the new information, because he had not conducted an evaluation of Tate with the new information. Nevertheless, he testified that "the question [of competency] is the same regardless of what the potential penalty is" and that, therefore, "the issues are not different in a death penalty case." He also acknowledged that in 2005 Tate understood the charges against him, the three possible sentencing options, and the fact that the decision as to his sentence would be for the judge or jury based on the evidence presented in the sentencing trial. Moreover, Cella testified that he never questioned Tate's competence to plead guilty. He explained that he knew that "it was a long shot that [Tate] would be found incompetent" and was only "grasping at straws" when he requested the 2005 competency evaluation, because Tate "wouldn't" — as opposed to "couldn't" — work with counsel once he decided to plead guilty and "wanted the death penalty."

As Tate failed to present any other evidence supporting this

claim, he failed to show a reasonable probability that, but for trial counsel's alleged deficiencies, he would have been found incompetent to enter a guilty plea in 2005, and the habeas court properly denied relief on this claim. See *Perkins v. Hall,* 288 Ga. 810, 823 (III) (C) (708 SE2d 335) (2011) (stating that "the issue of [a defendant]'s competence to stand trial was much narrower than the extremely broad issue of mitigating evidence in the sentencing phase," where such evidence implicated a number of mental health concerns, including childhood abuse, substance abuse from a young age, and issues regarding the defendant's self-control); *Colwell v. State*, 273 Ga. 634, 636 (2) (544 SE2d 120) (2001) (holding that a defendant was not improperly found competent to stand trial, where the defendant actively sought the death penalty, "likely suffered from a mental disease[,] and was plagued by a desire to die," because he "clearly understood the nature and object of his proceedings and . . . possessed the intellectual and communication skills necessary to participate in his own case in the manner that seemed best to him"). See also *Godinez v. Moran,* 509 U. S. 389, 396-399 (II) (A), (B) (113

91

SCt 2680, 125 LE2d 321) (1993) (holding that the standard for competence to stand trial and competence to plead guilty are the same, i.e., whether the defendant has "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" and a "'rational as well as factual understanding of the proceedings against him'" (quoting *Dusky v. United States,* 362 U. S. 402, 402 (80 SCt 788, 4 LE2d 824) (1960)).

*E. Ineffective Assistance of Counsel Claim Regarding Tate's Interview by the Trial Judge's Acquaintance.*

Tate contends that trial counsel were ineffective in that they allowed Tate to be privately interviewed by an acquaintance of the trial judge prior to Tate's entering a guilty plea. The habeas court's factual findings with regard to this claim are based upon trial counsel's habeas testimony and show the following. At some point during the trial proceedings, Mike Perry introduced himself to Cella as "a friend of [the trial judge]." Cella recalled that Perry was from England and was "either thinking about or actually in the process of" writing a book about the death penalty. Perry asked Cella about

92

speaking to Tate, and Cella responded that "[he] didn't know if [his] client would be willing to do that or not but [he] would ask him." When Cella asked Tate about speaking to Perry, Tate agreed to do so. Cella could only recall that "at some point" Tate and Perry had "a conversation . . . in a room by themselves." Cella did not know what the conversation entailed or whether Perry actually published a book. Reed testified similarly, although he was unaware of the conversation until Tate told him that he had talked to Perry, and he recalled that the conversation occurred before Tate's guilty plea. The habeas court concluded that trial counsel's performance in permitting Tate to be interviewed outside their presence by a "friend" of the judge conducting his bench trial was unreasonable and, thus, constituted deficient performance.

Pretermitting whether that conclusion was correct, the habeas court did not err in concluding that Tate had failed to show prejudice. Tate contends that, under the circumstances here, where the trial judge "surely" knew that his acquaintance was writing a book about the death penalty and sentenced Tate to death soon after

93

the interview, the trial judge's impartiality and ability to consider only the evidence presented could reasonably be questioned. Therefore, Tate argues, trial counsel's alleged error in allowing the interview with Perry was structural error not requiring proof of prejudice. See *Johnson v. United States,* 520 U. S. 461, 468-469 (II) (C) (117 SCt 1544, 137 LE2d 718) (1997) (noting that the Supreme Court has held that the "lack of an impartial trial judge" is structural error (citation omitted)). However, Tate did not introduce any evidence regarding whether Perry had an opinion about the death penalty, any evidence regarding what Tate and Perry discussed, any evidence that Perry relayed any information about the interview to the trial judge, or any evidence regarding the extent of the relationship that existed between Perry and the trial judge. Because Tate offered only speculation that the trial judge was biased or that his impartiality could reasonably be questioned, he has not shown a structural error. See *Barnett v. State,* 300 Ga. 551, 554-555 (2) (796 SE2d 653) (2017) (explaining that the "constitutional guarantee of due process is not concerned with mere appearances of

partiality" but with "*actual* bias" (citations and punctuation omitted; emphasis supplied)). Moreover, "as speculation is insufficient to satisfy the prejudice prong of *Strickland*," Tate has failed to carry his burden with respect to this alleged instance of ineffective assistance of counsel, and the habeas court did not err in rejecting this claim. See *Hulett v. State,* 296 Ga. 49, 69 (5) (c) (ii) (766 SE2d 1) (2014) (citation and punctuation omitted).

F.  *Ineffective Assistance of Counsel Claim Regarding Tate's Waiver of a Jury Trial as to Sentencing.*

Tate also contends that the habeas court erred in denying his claim that trial counsel were ineffective in persuading him to waive his right to a jury trial as to sentencing for the murder convictions.

> Whether to waive a jury trial is a strategic decision to be made by an accused after consultation with counsel. Strategic decisions of counsel (in this case, whether to advise [Tate] to waive a jury trial) are to be judged by whether the decision was . . . reasonable on the basis of the facts of the particular case, viewed as of the time of counsel's conduct.

*Head v. Thomason,* 276 Ga. 434, 439 (4) (578 SE2d 426) (2003) (citation and punctuation omitted).

In denying Tate's claim here, the habeas court relied on Cella's testimony that the decision to waive Tate's right to a jury trial as to sentencing was made after the trial court had summoned approximately 250 prospective jurors and the parties had spent approximately three weeks attempting to qualify jurors to serve on the case.[22]  Cella testified that, after hearing the trial court read the charges in the indictment against Tate to them, many of the prospective jurors stated that they could not consider a life sentence and that, "[b]y the time [counsel] got done questioning [the jurors], . . . [they] didn't have half the number of jurors qualified that [they] needed to have to try the case."  Cella explained that, when it appeared that the trial court would need to continue the case for weeks in order to summon more jurors and that the parties still might not be able to qualify a sufficient number of jurors, he talked with Tate about possibly waiving his right to a jury trial as to

---

[22] Cella testified that Tate "never wanted to have a trial" but, instead, wanted to plead guilty and accept a death sentence.  Cella explained that he told Tate that "that wasn't allowed" and that "he had to have [a jury trial]." According to Cella, Tate "accepted that."

sentencing for the murders. In an attempt to "outsmart[ ]" Tate, who "disagree[d with counsel] about what his goal should be," Cella suggested to Tate that he was more likely to get the sentence that he wanted in a bench trial by telling Tate that Cella only needed to get one juror "on [his] side" and that he considered himself to be "pretty good in front of a jury."

Cella testified that he spoke with individuals who knew the trial judge and "who had seen him presiding and seen the decisions that he had made over the course of his career" and that "every single person [he] talked to that knew the judge, including the people in the DA's office, told [him] that they didn't believe [the trial judge] would give the death penalty" and that the judge was not "gung-ho . . . in favor of the death penalty." In addition, Reed testified that he had personal experience with the trial judge, found him to be exceptionally "fair" and "open-minded," thought that he was "already leaning towards a life sentence," and was also aware of courthouse discussions that he would not impose the death penalty in Tate's case. Finally, Tate himself told the trial judge at

97

the plea hearing that he had been in his court as a juvenile and that he had found the trial judge to be a "very fair person" and thought that he "would give the appropriate sentence."

Accordingly, in light of the above, the habeas court did not err in holding that trial counsel's advice to Tate with respect to waiving his right to a jury trial as to sentencing did not constitute ineffective assistance of counsel.[23]  See *Thomason,* 276 Ga. at 439 (4) (holding that trial counsel's conduct in advising his client to waive a jury trial in the client's death penalty case was not ineffective assistance, where trial counsel's strategic reasons to favor a bench trial included a belief that the judge would think the defendant's crimes were less worthy of death than a jury would).

G.    *Ineffective Assistance of Counsel Claim Regarding the Failure to Present Certain Evidence.*

Tate contends that trial counsel rendered ineffective assistance in not presenting Chad Tate to testify at the sentencing trial that he had killed Katelyn Williams of his own volition and not at Tate's

---

[23] That is not to say that we endorse counsel's effort to "outsmart" his client in the hope of defeating his client's goal.

direction. Relatedly, Tate contends that trial counsel were ineffective in not introducing into evidence the transcripts of Chad Tate's custodial interview and the plea colloquies of both Chad Tate and Dustin Tate, which he contends would have "confirmed" that Chad Tate killed the child and were also relevant to Tate's culpability in other ways. Trial counsel's decisions regarding what evidence to present or to forego in defending a client charged with a crime are matters of strategy and tactics. See *McKay v. State,* 292 Ga. 886, 888 (2) (742 SE2d 714) (2013). "Reasonable trial strategy does not constitute deficient performance." Id.

With respect to presenting Chad Tate's testimony, as previously discussed, trial counsel testified that they had initially hoped to present Chad Tate and Dustin Tate to testify that their roles in the crimes were consistent with their plea colloquies and custodial statements, including that Chad Tate had killed Katelyn Williams of his own volition. The record also shows that Reed spoke with Chad Tate in anticipation of putting him on the stand. However, Reed testified that he recalled that Tate did not want

99

"Chad or Dustin to go back through testifying or taking the stand." Furthermore, a review of the transcripts of the sentencing trial and Chad Tate's plea colloquy shows that a reasonable attorney could have considered it sound trial strategy not to present Chad Tate as a witness or to introduce his custodial interview or his or Dustin Tate's plea colloquies. Chad Tate's custodial interview and his and Dustin Tate's plea colloquies included inconsistent statements about some of the details of Katelyn Williams's murder, statements that could be considered contrary to trial counsel's strategy to refute the State's argument that Tate was the leader of the group, and statements that were in some other way not favorable to Tate.

Moreover, as the prosecutor pointed out in his closing argument, trial counsel through their cross-examination of Major Goble "were allowed to get out everything they wanted [the trial court] to hear about Chad," specifically, the portions of Chad Tate's custodial interview that were both favorable to Tate and consistent with other evidence, thereby indicating that Chad Tate was telling the truth when he said that he slit Katelyn Williams's throat. The

100

prosecutor argued that trial counsel were "very clever in doing that," as "nobody knows from the evidence" who actually killed Katelyn Williams. The prosecutor also correctly noted the following: trial counsel objected when, "on redirect[, the State] tried to get . . . in[ ] the other portion[s] of what Chad said" that were not favorable to Tate; trial counsel objected when the State offered Chad Tate's custodial interview as an exhibit and the trial court sustained the objection; the State could not call Chad Tate as a witness under his plea agreement; and Chad Tate had been produced and was available to testify. Because Tate failed to show that trial counsel's decision not to present the evidence in question was unreasonable, counsel's performance was not deficient, and the habeas court did not err in denying him relief on this claim. See *Smith v. State,* 283 Ga. 237, 239-240 (2) (b), (c) (657 SE2d 523) (2008) (stating that counsel's reasonable decisions regarding defense strategy do not constitute deficient performance).

H. *Combined Effect of Trial Counsel's Alleged Deficiencies.*

Considering the combined effect of the alleged deficiencies that

we have assumed in the discussion above, we conclude that those alleged deficiencies would not in reasonable probability have changed the outcome of Tate's guilty plea hearing or sentencing trial. See *Schofield v. Holsey,* 281 Ga. 809, 811-812 n.1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's deficiencies should be considered).

### III. *Remaining Claims.*

### A. *Violation of the Right to a Speedy Trial Claim.*

In his cross-appeal, Tate contends that the habeas court erred in denying his claim that his right to a speedy trial under the state and federal constitutions was violated. The habeas court correctly found that, at least as an initial matter, this claim was procedurally defaulted, because Tate failed to raise it at trial and on direct appeal. See OCGA § 9-14-48 (d); *Black v. Hardin,* 255 Ga. 239, 240 (4) (336 SE2d 754) (1985). Therefore, to obtain relief on this claim in his habeas corpus proceedings, Tate must satisfy the cause and prejudice test. See id. Tate alleges that his counsel's ineffectiveness in failing to make a speedy trial demand in the trial proceedings or

to raise the claim on direct appeal excuses the procedural default of this claim. See *Perkins,* 288 Ga. at 822 (III) (C) (explaining that "[a] common method of satisfying the cause and prejudice test is to show that trial and direct appeal counsel rendered ineffective assistance").

With regard to the first prong of *Strickland,* "[w]hether to file a demand for speedy trial is usually a matter of trial tactics and strategy, as a delay in bringing the case to trial may work to a defendant's advantage." *Smith v. State,* 297 Ga. 214, 217 (5) (a) (773 SE2d 209) (2015) (citation and punctuation omitted). Furthermore, "[a]s with other tactical or strategic decisions, trial counsel's decision to file, or not, a demand for speedy trial should not be evaluated in hindsight." *Jones v. State,* 296 Ga. 561, 569 (6) (769 SE2d 307) (2015). The habeas court found that trial counsel acted reasonably in not filing a speedy trial demand "as they were trying to convince [Tate] that he did not want the death penalty." With no citation to the record, Tate argues that it "is unrefuted that [Tate] did not want the death penalty from 2002 until 2005" and that "[i]t was only after

103

the inordinate, unconstitutional delay that he began to evoke [sic] religious reasons for pleading guilty." However, as previously discussed, the habeas court credited trial counsel's testimony that Tate's desire for the death penalty was an "evolving process" and that counsel thoroughly discussed Tate's views with him, tried several approaches to persuade him differently, and eventually obtained a second competency evaluation of him when they were unable to change his mind. Moreover, Tate's certified medical records from his treatment at Three Rivers approximately two months after his arrest that he submitted as evidence in his habeas proceedings reflect that he reported to the evaluator that he was "consider[ing] asking for [the] death penalty." Thus, the record supports the habeas court's finding that "[Tate]'s desire to receive the death penalty developed over the course of trial counsel's representation."

In any event, regardless of exactly when his decision to plead guilty and ask for the death penalty became fixed, Tate made no affirmative showing that the failure of his trial counsel to seek a

speedy trial was not a reasonable trial strategy under the circumstances existing at the time of counsel's representation. See *Jones,* 296 Ga. at 569 (6). Tate never questioned trial counsel about their reasons for not filing a demand, and the record shows that a reasonable attorney could have considered it strategically advantageous not to file such a demand. Trial counsel engaged in serious plea negotiations with the State that, if successful, would have resulted in Tate's receiving a sentence less than death, and Reed testified that "[t]he State wanted to offer a life sentence, so there was no rush at that point." Trial counsel's billing records show that, after plea negotiations ended with no deal in April 2004 when Tate refused to plead guilty to the child molestation charge and until the trial court issued its July 5, 2005 order scheduling the trial to begin on October 24, 2005, trial counsel completed a great deal of work in preparation for trial, including, among other things, litigating ex parte motions, retaining and working with their firearms expert, reviewing the State's discovery and evidence, meeting with Tate multiple times, consulting with co-counsel and

105

with Dr. Richards, reviewing documents, and meeting with the district attorney and the trial judge. Accordingly, Tate failed to carry his burden of showing that trial counsel were deficient in this regard. Therefore, his ineffective assistance of counsel claim with respect to the failure to file a speedy trial demand fails. See *Barker v. Barrow,* 290 Ga. 711, 712 (723 SE2d 905) (2012) ("The failure to satisfy either prong of the *Strickland* test will defeat an ineffective assistance of counsel claim."). Consequently, Tate's claim that his constitutional right to a speedy trial was violated remains procedurally defaulted, and the habeas court properly denied him relief on this ground.

B. *State's Pursuit of Contradictory Theories Claim*.

Tate alleges that the habeas court erred in rejecting his claim that the State pursued inconsistent theories of culpability in violation of the due process clauses of the state and federal Constitutions. Tate contends that the State first construed the evidence at Chad Tate's guilty plea colloquy to infer that Chad Tate murdered Katelyn Williams and that the State subsequently argued

at Tate's sentencing trial that Tate murdered the child. The habeas court correctly found that, at least as an initial matter, this claim was procedurally defaulted, because Tate failed to raise it at trial and on direct appeal. See OCGA § 9-14-48 (d); *Hardin,* 255 Ga. at 240 (4). The habeas court summarily concluded that Tate "had failed to establish cause and actual prejudice, or a miscarriage of justice,[24] sufficient to excuse his procedural default of th[is] claim[ ]," without explicitly addressing Tate's argument that trial counsel's ineffectiveness in failing to object to the State's arguments at trial and to raise the issue on appeal constitutes sufficient cause and prejudice to overcome the procedural default of this claim. See *Perkins,* 288 Ga. at 822 (III) (C). Nevertheless, the prejudice necessary to satisfy *Strickland* prejudice, the prejudice required to satisfy the cause and prejudice test, and the analysis of the merits

---

[24] Tate has not argued that the miscarriage of justice exception applies to this claim. See *Perkins,* 288 Ga. at 824 (III) (D) (explaining that Georgia's "statutory miscarriage of justice exception has always been interpreted as a very narrow exception tied to evidence of *actual innocence*" (citation and punctuation omitted)); *Valenzuela v. Newsome,* 253 Ga. 793, 796 (4) (325 SE2d 370) (1985).

of any underlying constitutional claim are all equivalent. See *Whatley v. Terry,* 284 Ga. 555, 560 (2) (668 SE2d 651) (2008); *Head v. Ferrell,* 274 Ga. 399, 402 (III) (554 SE2d 155) (2001). Therefore, even assuming that Tate had a due process right to prevent the prosecution from pursuing inconsistent theories to prosecute him and his co-defendant brothers,[25] Tate's underlying inconsistent theories claim has no merit as a matter of law, as the discussion below demonstrates. Thus, Tate cannot show that he was prejudiced by any alleged deficiencies of counsel with regard to this claim, and, therefore, he cannot show that trial counsel were ineffective in not raising this claim. Consequently, he cannot overcome his procedural default of this claim, and it remains procedurally defaulted.

Specifically, a review of the trial record shows that the State never adopted as its theory Chad Tate's version of how Katelyn

---

[25] See *Battle v. State,* 305 Ga. 268, 274 (2) (b) (824 SE2d 335) (2019) (stating that the Eleventh Circuit has cast doubt on whether a due process right to prevent the prosecution from using inconsistent theories to prosecute co-defendants exists, citing *United States v. Hill,* 643 F3d 807, 834 (II) (C) (11th Cir. 2011), but assuming that such a right exists for purposes of addressing the defendant's claim).

Williams's murder occurred but, instead, proceeded under the theory that the evidence did not conclusively show who actually performed the physical act of taking Katelyn Williams's life. During Chad Tate's plea colloquy, the prosecutor proffered that, consistent with Chad Tate's custodial interview, the evidence would show that Chad Tate strangled Katelyn Williams with a telephone cord until he thought that she was dead and that he had then returned to Tate, who was searching the home for drugs, when he heard the child start crying again. The prosecutor then stated: "[S]o [Chad Tate] borrows — he asks — or takes — the knife . . . back into the bedroom where Katelyn is coming to and is reviving, turns her over onto her face, puts a pillow over her, *according to his version*, and cuts her from ear to ear." (Emphasis supplied.) Later the prosecutor stated:

> [B]y the way, [Tate] . . . said actually on the [videotape of his custodial interview], I gave that child every chance to shut up, but she wouldn't shut up. *His version* is that Chad comes out after choking [sic] with the telephone cord and asks for his knife, whereupon he reaches and hands him the knife. Chad says he simply got the knife out of his sheath — out of his holster.

(Emphasis supplied.) See *King v. Hawkins,* 266 Ga. 655, 656 (469

109

SE2d 30) (1996) ("A trial court need not make itself aware of evidence establishing the pleader's guilt beyond a reasonable doubt in order to satisfy itself subjectively that the pleader knows both what he has done and that those acts constitute the crime with which he is charged.").

After Chad Tate and Dustin Tate entered their pleas, trial counsel filed and argued a pretrial motion for an order to preclude the prosecution from changing theories regarding who murdered Katelyn Williams. The State argued that it could not respond "until the evidence comes out in this case," and the trial court denied the motion. At Tate's plea colloquy, the prosecutor stated in setting forth a factual basis for Tate's guilty plea that, after Chad Tate's attempt to strangle Katelyn Williams failed, "[b]y Chad's statement," Chad Tate took Tate's knife and cut her throat, killing her. However, the prosecutor pointed out that "there's evidence that may suggest this is not necessarily what happened." See *Hawkins,* 266 Ga. at 656. At Tate's sentencing trial, the State presented testimony that the evidence indicated that more than one person

was involved in the crimes and that, while "just one person" acting alone could have murdered Katelyn Williams, the physical evidence did not indicate who actually performed the act. The State also elicited testimony from Major Goble, the lead investigator on the case who took Chad Tate's custodial statement prior to his guilty plea, that Chad Tate's "version" of events was "inconsistent" with the evidence in certain specific respects. Therefore, the State never decisively adopted as its theory Chad Tate's version of how Katelyn Williams's murder occurred.

Near the beginning of his closing argument in Tate's sentencing trial, the prosecutor stated:

> Now, there's a possibility. I'm not saying it's not true, [sic] I don't know. Only Nick Tate knows. Only Chad Tate knows. Only Dustin Tate knows what actually happened in that house. But I can tell you that Nick Tate may, when he entered his plea told you exactly what happened, one hundred percent truthful, or he may have been lying to protect himself.

Then the prosecutor pointed out that at his plea colloquy Tate had admitted to the child molestation charge, which he had originally denied and which "mean[t] nothing" in terms of what

111

sentence Tate would actually serve. The prosecutor also reminded the trial court that Tate had originally stated in his custodial interview and had consistently maintained that he had accidentally shot Chrissie Williams when the gun misfired, even to the extent of developing an "elaborate story" that the same gun had later misfired in a hotel room during their flight. The prosecutor also reminded the trial court that at his plea hearing Tate had "chang[ed] that story" and confessed to intentionally shooting Chrissie Williams in the head, but only after learning through discovery that the State's expert would testify that the gun that killed Chrissie Williams "[could] not fire without intentionally pulling the trigger" and that it took "eleven and a half pounds of pressure . . . to pull that trigger." Then the prosecutor argued to the trial court: "I believe [Tate] admitted to those charges because it gives him credibility before you so that when he says 'I didn't have anything to do with Katelyn's killing,' that gives him believability and credibility."

The prosecutor then argued from the evidence presented in the sentencing trial that Tate was "in charge" from "day one" and that

he may not have been telling the truth about who slit Katelyn Williams's throat.  Specifically, the prosecutor noted the following: Tate was the one who on the morning of the incident used his credit card to purchase items used in the crimes, including the knife used to kill Katelyn Williams; according to his own statement at his plea colloquy, Tate shot Chrissie Williams after Dustin Tate told him that he could not do it; Chad Tate strangled Katelyn Williams after Tate ordered him to shut her up; Katelyn Williams's blood was only on Tate's weapon; the Mississippi kidnapping victim testified that it was Tate who "stuck the gun in her ribs," "got into the passenger's seat[,] and told her to drive"; Tate stated in his custodial interview that "[he] decided [they] need[ed] to turn [them]selves in"; and, indeed, Tate was the one who negotiated with the FBI for the three brothers' surrender to authorities.  The prosecutor also argued that Chad Tate had no need to obtain Tate's knife, because he already had a knife with him, and he reminded the trial court that the kidnapping victim testified that Tate had told her that "[he] h[ad] already killed a mother and a daughter."

As Tate points out, the prosecutor did incorrectly argue that "there's only blood on [Tate]'s jeans." However, he later corrected his misstatement and apologized to the trial court, explaining that "[t]here were actually two pair of jeans that had some of Katelyn's blood on them." Consistent with the evidence, he then argued that "[Tate's jeans] had enough blood to actually have a physical stain on them" and that the State's expert had "pointed to a couple of places down along the leg . . . which, again, is very consistent with him being in Katelyn's room when she was murdered." Then the prosecutor asserted that it was impossible to know "[w]hich Nick Tate was telling the truth," the one interviewed shortly after he was taken into custody or the one who appeared before the trial court at his plea colloquy. The prosecutor contended: "At [the] very minimum, Judge, [15-year-old Chad Tate] was nothing more than another of Nick Tate's weapons . . . doing his bidding, 'go in there and shut that kid up like I told you to.'"

Aside from his one misstatement to the trial court, which he corrected, the prosecutor's arguments were based on reasonable

inferences from the evidence. "Counsel certainly are permitted to argue reasonable inferences from the evidence presented at trial." *Gissendaner v. State,* 272 Ga. 704, 712 (9) (532 SE2d 677) (2000). See *Daniel v. State,* 301 Ga. 783, 787 (III) (804 SE2d 61) (2017) (stating that counsel are "certainly permitted to hypothesize about what may have occurred"); *Wyatt v. State,* 267 Ga. 860, 864 (2) (a) (485 SE2d 470) (1997) (stating that "the prosecutor has wide latitude to argue inferences from the evidence"). Given the uncertainty of the evidence as to who actually killed Katelyn Williams and the fact that Tate had changed his story regarding Chrissie Williams's murder and Katelyn Williams's molestation, the prosecutor did not violate Tate's right to due process by arguing the possibility that he also lied about not being the one who actually committed Katelyn Williams's murder. Cf. *Parker v. Singletary,* 974 F2d 1562, 1578 (III) (11th Cir. 1992) (finding no due process violation in the State's failure to disclose that it inconsistently argued at the trial of the defendant and two of his co-defendants that the accused on trial was the triggerman, where the State did not use

evidence it discredited in the co-defendants' trial to show that the defendant was the triggerman and where, "[d]ue to the lack of evidence [as to which defendant actually committed the murder], the only inconsistency was in the state's alternative arguments").

Relatedly, Tate claims that the prosecutor's use of false "evidence" during closing argument violated *United States v. Bagley,* 473 U. S. 667 (105 SCt 3375, 87 LE2d 481) (1985), *Giglio v. United States,* 405 U. S. 150 (92 SCt 763, 31 LE2d 104) (1972), and *Napue v. Illinois,* 360 U. S. 264 (79 SCt 1173, 3 LE2d 1217) (1959). The habeas court found that counsel did not object at trial to the State's presenting "a false, prejudicial argument" regarding who murdered Katelyn Williams, that the issue would have been found to have been waived if it had been raised on direct appeal because of the lack of objection, and that it was therefore defaulted in the habeas proceedings.

However, as this Court has previously explained, although contentions regarding allegedly improper arguments are waived on direct appeal with regard to the defendant's guilt where no

116

objections were raised to those arguments in the trial court, under the review required by OCGA § 17-10-35 (c) (1) in death penalty cases, "even if improper arguments have not been timely objected to at trial, reversal is required if there was a reasonable probability that the improper arguments changed the jury's exercise of discretion in choosing between life imprisonment or death," which is the same standard as required to prove *Strickland* prejudice in an ineffective assistance claim regarding the sentencing phase of a death penalty trial. *Hicks v. State,* 256 Ga. 715, 730 (23) (352 SE2d 762) (1987) (citation and punctuation omitted); *Ford v. State,* 255 Ga. 81, 90 (8) (i) (335 SE2d 567) (1985) ("[W]here the prosecutor argues improperly and no objection is interposed, whether reversal is required depends upon an evaluation of prejudice that is undertaken in an essentially identical manner whether the improper arguments are considered directly or in the context of an ineffectiveness claim."), vacated on other grounds by *Ford v. Georgia,* 479 U. S. 1075 (107 SCt 1268, 94 LE2d 129) (1987).

Nevertheless, the habeas court was correct in further finding

117

that Tate had failed to establish ineffective assistance of counsel to overcome his procedural default of this claim. See *Perkins,* 288 Ga. at 822 (III) (C). As discussed above, the prosecutor corrected his one misstatement about Katelyn Williams's blood only being on Tate's pants, and the remainder of his argument was based on reasonable inferences from the evidence. Therefore, because the prosecutor's arguments were not improper, trial counsel were not ineffective in not objecting. See *Yancey v. State,* 292 Ga. 812, 818-819 (4) (740 SE2d 628) (2013) ("As a matter of law, a failure to interpose a meritless objection does not amount to unreasonable performance."). For that same reason, had trial counsel raised the claim on direct appeal, it would have provided Tate no relief under the review mandated by OCGA § 17-10-35 (c) (1). See *Ford,* 255 Ga. at 90 (8) (i) (explaining that only if improprieties are discovered in the state's argument does this Court then determine whether those improprieties "were so egregious as to require a new trial").

C. *Conflict of Interest Claim.*

Tate contends that the habeas court erred in rejecting his claim

118

that his post-conviction counsel labored under a conflict of interest due to their failure to establish a relationship with him and to timely attend to his case.[26] However, a criminal defendant has no absolute right under the Sixth Amendment to the appointment of another attorney as a matter of right whenever he expresses his dissatisfaction with his present attorney; "rather, the choice of appointed counsel is a matter of the trial court's discretion." *Hulett,* 296 Ga. at 56 (3). See *Morris v. Slappy,* 461 U. S. 1, 14 (IV) (103 SCt 1610, 75 LE2d 610) (1983) (rejecting "the novel idea that the Sixth Amendment guarantees an accused a 'meaningful attorney-client relationship'"); *Smith v. State,* 273 Ga. 356, 358 (2) (541 SE2d 362) (2001) (stating that the Sixth Amendment "guarantee[s] effective assistance of counsel, not . . . preferred counsel or counsel with whom a 'meaningful relationship' can be established" (citation and

---

[26] Because conflict of interest claims are one type of actual ineffective assistance of counsel claim, see *Strickland,* 466 U. S. at 692 (III) (B), and one of Tate's trial attorneys remained as post-conviction co-counsel, Tate could not have raised this claim on direct appeal. See *Hood v. State,* 282 Ga. 462, 463 (651 SE2d 88) (2007) ("[A] claim of ineffective assistance of trial counsel cannot be pursued unless trial counsel is no longer representing the convicted defendant."). Therefore, the habeas court properly did not find this claim procedurally defaulted.

punctuation omitted)). A trial court abuses its discretion in denying a defendant's request regarding the appointment of counsel "only when the defendant's choice 'is supported by objective considerations favoring the appointment of the preferred counsel, and there are no countervailing considerations of comparable weight.'" *Hulett,* 296 Ga. at 56 (3).

With those principles in mind, a review of the relevant undisputed facts in the record and those found by the habeas court shows the following. Cella, who remained on Tate's case as post-conviction counsel, timely filed a motion for new trial on the general grounds on January 18, 2006. The trial court appointed attorney Mitch Durham to serve with Cella. After agreeing to take a position with the Cobb County District Attorney's Office, Cella withdrew from the case, and Reed joined Durham as co-counsel. From September 2007 until February 2009, Tate wrote to the trial court several times requesting that the court appoint him "nonconflicted, competent counsel" in order "to avoid any and all future delays of the proceedings of this case." The trial court responded to Tate in

a letter assuring him that he had spoken with Durham, who advised the court that he had been very busy with court proceedings recently "but would be in touch with [Tate] shortly." The trial court also assured Tate that Durham was "well thought of and came highly recommended from the defense bar" and that the court would again encourage Durham to contact him.

The trial court subsequently held a status hearing on Tate's motion for new trial on June 30, 2009. At that hearing, Durham explained to the trial court that he had been involved in a death penalty trial when he was appointed to Tate's case and that after its conclusion he spoke with Tate by telephone to discuss his case. A few days later, Durham received a letter from Tate stating that, based on their conversation, Tate did not feel that Durham was competent to represent him and that Tate was going to have no further contact with him. Tate also refused a package from Durham containing copies of the sentencing trial transcripts that Durham had mailed to him pursuant to Tate's request, and Tate also refused receipt of a letter from Reed. Durham had spoken with Tate's

121

mother multiple times about helping counsel establish some rapport with Tate, a direction that had appeared promising, but he had not heard back from her or been able to reach her in several weeks. Durham told the trial court that counsel could have an amended motion for new trial ready shortly but that they would like to talk to Tate first.

Tate was then allowed to address the trial court. He stated that he "d[id] not wish to proceed with a motion for new trial at all," and he requested that both Durham and Reed be removed from his case. He also confirmed that Durham had spoken with him on the telephone one time and written to him "numerous times," as well as visited him on one occasion, and that he had "denied any and all other phone calls" from both Durham and Reed. Tate accused his counsel of "not hav[ing] his best interest at heart." Once again Tate expressed his belief that "capital punishment was reserved . . . for such cases as [his] own" and that his remorse for his crimes "d[id] not mitigate the fact that [he was] still guilty." Therefore, he contended, "[u]ntil [he wa]s put to death, justice [wa]s being denied."

122

Then he explained his conflict with his post-conviction counsel as follows:

> I have a full understanding of what's going on. You know, who you are, who I am, who the lawyers are and how this has developed. . . . Now, I'm just simply allowing the courts to go through and do what they need to do.
> Now, these people over here, these gentlemen over here, they want to fight. They want to twist, elude, divert. . . . I do not trust them at all, either one of them.

The trial court then sought confirmation from Tate that he did not wish to have Durham and Reed to represent him, and Tate responded, "No, sir. I do not wish to have any attorneys represent me." Tate reiterated that he did not want to go forward with a motion for new trial and that "[n]one of [his] rights were violated." He also stated that he "chose to waive any and all future appeals" but that he understood that a motion for new trial and direct appeal to this Court were required. Durham also agreed that, under Georgia law, a defendant could not waive the direct appeal of his death sentence, but he believed that the law required more than "just going through the motions." Therefore, he explained that he and Reed intended to act as "vigorous[ly] as [they] could" as Tate's

post-conviction counsel and that he took exception to Tate's accusation that they were "going to be lying and misconstruing things." However, upon the trial court's inquiry, he opined that Tate could waive the motion for new trial. Reed told the trial court that he thought the actual conflict was that Tate was concerned only with "the moral issue of the case," which in his mind was "fairly clear," namely, that "he fe[lt] like he committed an act worthy of death"; however, Reed said that counsel's role was "to look at the legal process and evaluate it differently than [Tate] d[id]."

Then Tate stated the following:

> Like I said, as far as I'm concerned, I wish to waive the motion for new trial. If it is against the law, then we will proceed. But if it is not, if it is my right to do such, I ask that it be remanded [sic] to the Georgia Supreme Court and let them make their decision based upon these transcripts and what went on at trial, nothing more.
> And if you do chose [sic] to make me proceed on with a motion for new trial, I ask that both of these attorneys be replaced because any and all correspondence will be terminated in the future and [sic] it has been in the past. I do not wish to speak to these individuals, either one of them again.

On July 7, 2009, the trial court entered an order stating the

124

following:

> During the hearing [on June 30, 2009], Nicholas Cody Tate addressed the Court and expressed his desire to waive his right to a Motion for New Trial while preserving his remaining appeal rights granted by the Unified Appeal. The Trial Court observed Nicholas Cody Tate to possess the ability to understand the nature of the proceedings and the right he was waiving in addition to having the ability to effectively communicate his decision to the Court.

Consequently, the trial court found "that [Tate] voluntarily and knowingly waived his right to a Motion for New Trial" and accepted Tate's waiver, thereby allowing the motion for new trial to be withdrawn. The trial court did not remove Durham and Reed from Tate's case, and they filed a direct appeal brief with this Court on January 11, 2010.

Tate now alleges that the trial court's investigation was insufficient. However, the trial court was familiar with both attorneys' qualifications and experience, and at the hearing the court heard from counsel regarding what they had done in the case and the possible reasons for the problems in communication. The trial court also gave Tate ample opportunity to voice his complaints

125

about them. Although at the hearing Tate initially stated that he did not want any attorneys on his case and at another point said that he wanted his post-conviction counsel "replaced," he eventually concluded that he desired that Durham and Reed be removed from his case and replaced with new counsel *only if* he were legally required to proceed with the motion for new trial. Tate stated that, in the event that he could simply move directly to filing the direct appeal in this Court, he wished to do so. Tate was not required to pursue a motion for new trial. See UAP IV (A) (1) (a) (". . . A defendant may, but is not required, to file a motion for new trial. . . ."). However, both the UAP and the statutory basis for appellate review of death penalty cases require a limited mandatory review by this Court. See OCGA § 17-10-35; UAP IV (A) (3) (a) ("It shall be the duty of the superior court to transmit the entire record, . . . as defined in [the UAP], to the Supreme Court for review regardless of whether a notice of appeal has been filed."); *Colwell,* 273 Ga. at 338-339 (2) (stating that neither a defendant nor his attorney could withdraw the defendant's mandatory direct appeal in his death

126

penalty case).

Tate's statements show that the only conflict that he had with his counsel was that he wanted to forego the motion for new trial and proceed as quickly as possible with the mandatory direct appeal to this Court and that he did not intend to work with any attorney in filing that appeal. Moreover, Durham's statement to the trial court that counsel could have an amended motion for new trial prepared shortly indicates that they had done a great deal of work on the case, which is corroborated by the fact that counsel filed a notice of appeal in Tate's case in the trial court within 30 days of the trial court's order allowing Tate to withdraw his motion for new trial and timely filed a brief on Tate's behalf in his direct appeal. See *Chapel v. State,* 264 Ga. 267, 269-270 (3) (c) (443 SE2d 271) (1994) ("The amount of time and effort expended by an attorney on behalf of a criminal defendant are weighty considerations in determining whether that attorney should be appointed to represent the defendant."). Tate has not shown that the trial court abused its discretion in allowing Durham and Reed to remain on his case to

litigate his mandatory appeal to this Court. See *Hulett,* 296 Ga. at 59 (4) (stating that a defendant's "good relationship" with counsel is not as persuasive a consideration in post-conviction proceedings "where the bulk of counsel's work is with the record under review"). Therefore, the habeas court did not err in rejecting this claim.

### D. *The Warden's Request to Call Tate to Testify.*

Because of our decision in Division II (C) above reversing the habeas court's finding that trial counsel were ineffective in investigating and presenting Tate's case for mitigation, we need not address the Warden's contention that the habeas court erred in denying his request to call Tate as a witness at the evidentiary hearing to testify concerning the allegations that he made in his habeas petition relating to this claim.

### E. *Abandoned Claims*

Tate's remaining claims, which he presented as a mere list and which he supported only by an improper attempt to incorporate arguments made in the habeas court rather than in this Court, are deemed abandoned. See Supreme Court Rule 22; *Whatley,* 284 Ga.

128

at 573 (VI) (finding death penalty habeas claims abandoned under Supreme Court Rule 22).

*Judgment affirmed in Case No. S19X0826. Judgment reversed in Case No. S19A0825. All the Justices concur.*

BLACKWELL, Justice, concurring.

I join the opinion for the Court, which identifies several reasons to reject the various claims for relief that have been asserted by habeas counsel on behalf of Nicholas Cody Tate. I write separately to note another — Tate himself apparently didn't want any relief. On the morning that the evidentiary hearing in the habeas court was set to begin, Tate gave one of his lawyers a handwritten statement, in which he said unequivocally that he wished to withdraw his habeas petition, forego further judicial review of his death sentence, and permit the State to carry out the sentence "without any further protests on my behalf."[27] The lawyer tendered

---

[27] Entitled "Motion to Withdraw Filings and Termination of Appeals Notice," the statement reads as follows:

Comes now Nicholas Cody Tate, petitioner in the above styled case and moves this court to allow any-all state habeas corpus filings to be withdrawn; and that this be formal notice to allow the State's sentence of death to be carried out without any further protests on my behalf.

1. After careful consideration and deliberation with state appointed attorneys from both the Federal Defenders Program and the Georgia Resource Center; and the diligent efforts put forth in reviewing all court transcripts from all court proceedings, I am satisfied that any-all of my pretrial and post[-]conviction concerns have been presented and properly addressed and considered by the

the statement to the habeas court "under protest" and objected to the court putting any questions to Tate about the statement. At that point, the habeas court indicated its intent to proceed with the hearing, and Tate asked to be excused from the courtroom. The habeas court then addressed Tate directly and said that "we're going to go on forward with this case today" and "you're going to stay in here and you're going to hear the case." Tate said that he wished to "have nothing else to do with my attorneys," and the habeas court responded that it would not discharge the lawyers. The hearing then proceeded.

The next day, near the conclusion of the evidentiary hearing,

---

courts. I do hereby testify, of my own free will, that I stand complete and utterly content with the sentence of death handed down by the Superior Court of Paulding County in late 2005; and upheld by the Georgia Supreme Court on June 28, 2010. I therefore come today to withdraw any-all state habeas corpus filed on, or after, January 31st, 2012 on my behalf; and I do not wish any other petitions filed in this case.

2. I hereby voluntarily termanate [sic] any-all further appeals of my conviction and death sentence. I wish this to serve as formal notification of my intent decision to abandon any-all further legal representation, of any kind; and now formally waive any-all additional avenues of relief. I look to the courts for your assistance in achieving a final conclusion to the matter of The State of Georgia vs. Nicholas Cody Tate.

the habeas court again spoke directly with Tate about his statement. Tate signed the statement and affirmed that it reflected his genuine wishes. He also reaffirmed his desire to end his relationship with his lawyers. The habeas court spoke to Tate about the usefulness of legal counsel, asked a "rhetorical question" about whether the court had "an obligation to protect an individual from his or her own decisions," and the hearing came to an end shortly thereafter.

Four-and-a-half years later, the habeas court entered its final order, granting habeas relief with respect to the death sentence. In that order, the habeas court denied Tate's request to withdraw his petition on the ground that Tate had a "history of changing his mind." As evidence of this history, the habeas court noted that Tate had refused to authorize the filing of a habeas petition until only hours before his scheduled execution in January 2012.

Although no one claims in this appeal that the denial of the request to withdraw was error, it seems to me that the request was mishandled in the habeas court. A competent adult generally gets to decide for himself whether to seek relief from the courts, and that

132

principle holds even when applied to an inmate under sentence of death who wishes to forego the opportunity to pursue habeas relief. See *Kellogg v. Zant*, 260 Ga. 182, 183 (1), (3) (390 SE2d 839) (1990) (dismissing application for certificate of probable cause to appeal from dismissal of "next friend" habeas petition, where inmate under sentence of death on whose behalf petition was filed had expressed desire to discontinue further litigation). To be sure, a waiver of the right to pursue habeas relief is binding only to the extent that it is voluntary, knowing, and intelligent, see *Rawles v. Holt*, 304 Ga. 774, 777 (822 SE2d 259) (2018), and the fact that a petitioner previously has changed his mind about seeking habeas relief surely is reason to be skeptical about whether his sudden announcement of a desire to discontinue the proceedings is sufficiently fixed, firm, and genuine to reflect a voluntary, knowing, and intelligent decision. But a reason to be skeptical about a request to discontinue habeas proceedings is not itself a sufficient reason to refuse the request.

When presented with Tate's sudden request to withdraw his habeas petition and waive further review of his death sentence, the

habeas court would have been right to proceed cautiously, especially in light of the fact that Tate may have changed his mind once before.[28] The habeas court would have been authorized, for instance, to question Tate at length about his decision. To ensure that the decision was fixed and firm, the habeas court likewise would have been authorized to bring Tate back to court at some later date and to inquire whether he still desired to withdraw his petition. (Considering that the habeas court did not render its final decision until four-and-a-half years after the evidentiary hearing, there was more than adequate opportunity for the court to revisit the issue

---

[28] I am not so sure that Tate's decision to authorize the filing of a habeas petition "hours before" his scheduled execution in January 2012 reflects a sincere change of mind about the desirability of habeas relief. After all, a federal habeas petition filed on his behalf by his brother as a "next friend" was pending at the time, and for that reason, it is not clear that his execution would have gone forward in any event. And more important, we do not know *why* he authorized the filing of a state habeas petition on the day of his scheduled execution; perhaps it was because he genuinely decided at that point that he wanted habeas relief, or perhaps it was for some other reason. Cf. *Kellogg*, 260 Ga. at 183 n.1 (noting that inmate consistently had declined opportunities for post-conviction review of death sentence, except that he permitted filing of a petition for writ of certiorari in the United States Supreme Court following direct review "because of his mother's illness"). As the opinion for the Court explains thoroughly, Tate consistently has declined to fight his death sentence in most of his post-conviction proceedings.

with Tate.) And if the court had any questions about his competence to make such a decision, the court could have held a hearing to receive evidence and resolve those questions.[29] But the court did none of these things, and as the record now stands, it shows only an unequivocal request by Tate to withdraw his habeas petition and no sufficient basis for concluding that his request is the product of anything other than the free, voluntary, and intelligent decision of a competent adult. To deny him the right to choose for himself whether to continue his habeas proceedings on this limited record was wrong.

A brief word about the obligations of habeas counsel also is in order. A lawyer representing a competent adult has an ethical obligation to "abide by [the] client's decisions concerning the scope and objectives of representation. . . ." Ga. R. Prof. Conduct 1.2 (a). When a habeas petitioner represented by counsel indicates that he wishes to withdraw his petition and discontinue the proceedings, his

---

[29] No one expressed doubts in the habeas court about whether Tate now is competent to make decisions for himself about his case.

lawyer certainly may take some time to fully advise the petitioner about his legal options, to take care that the petitioner has not made his decision under any misapprehension of the law, and to ensure that the decision is a sincere, voluntary, and unequivocal one. And if the lawyer doubts that the petitioner is competent to make the decision, the lawyer has an obligation to raise the question of competence with the court. But once the lawyer has discharged these responsibilities, the lawyer ultimately must honor the decision of a competent client. And at that point, the ethical obligation of the lawyer is to help the client achieve the lawful objective of the representation — here, the discontinuation of habeas proceedings — not to press on with the pursuit of relief that the client no longer wants.

There is no provision of the Rules of Professional Conduct that relieves a lawyer of this obligation simply because the client is under sentence of death or the lawyer believes that the decision of his client is a bad one. A lawyer with a competent client under a death sentence is not free to do whatever the lawyer wants, irrespective of

the wishes of his client. To the contrary, the lawyer must faithfully represent his client in the cause that the client has determined to pursue — not another cause that the lawyer would prefer — and bear in mind that he is "only an assistant to the [client] and not the master of the defense." *Morrison v. State*, 258 Ga. 683, 686 (3) (373 SE2d 506) (1988) (addressing obligations of sentencing counsel) (citation, punctuation and emphasis omitted). See also *Colwell v. State*, 273 Ga. 634, 639 (3) (b) (544 SE2d 120) (2001) ("By ensuring that counsel respected Colwell's wishes, the trial court did not transform counsel into *co*-counsel, rather, it ensured that counsel served as *Colwell's* counsel." (Emphasis in original.)). The record in this case leaves me unconvinced that the representation of Tate has fulfilled this fundamental requirement of professional responsibility.[30]

---

[30] To be clear, I do not definitively conclude that Tate's habeas counsel have acted unethically. Because the habeas court failed to revisit the request with Tate at some point after the conclusion of the evidentiary hearing, we do not know if Tate — after further consultations with his lawyers in the days, months, and years following the evidentiary hearing — changed his mind again at some point and directed his lawyers to carry on with the effort to

I am authorized to state that Justice Boggs, Justice Peterson,

and Justice Bethel join in this concurring opinion.

---

obtain habeas relief. If he gave his counsel such a direction, however, we note that they never apparently communicated it to the habeas court, which considered the request to withdraw to be an open issue when it entered its final order.

I also draw no firm conclusion about the extent to which the attempts by trial counsel to "outsmart" Tate, which are discussed in the opinion for the Court, were unethical. But as the lead opinion notes, such attempts certainly are not to be condoned.

DECIDED OCTOBER 31, 2019 – RECONSIDERATION DENIED NOVEMBER 14, 2019.

Habeas corpus. Butts Superior Court. Before Judge Irwin from Rockdale Circuit.

*Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Tayo Popoola, Sabrina D. Graham, Assistant Attorneys General*, for appellant.

*Mark E. Olive, Vanessa J. Carroll*, for appellee.